Argued and submitted December 3, 2015, affirmed on appeal, cross-appeal dismissed as moot March 30; Johnson's petition for review denied, Premo's petition for review allowed August 4, 2016 (360 Or 235)

MARTIN ALLEN JOHNSON,
*Petitioner-Respondent*
*Cross-Appellant,*

*v.*

Jeff PREMO,
Superintendent,
Oregon State Penitentiary,
*Defendant-Appellant*
*Cross-Respondent.*

Marion County Circuit Court
06C16178; A154129

370 P3d 553

David B. Thompson, Assistant Attorney General, argued the cause for appellant-cross-respondent. On the opening brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, Kathleen Cegla, Assistant Attorney General, and Leigh A. Salmon, Assistant Attorney General. With him on the reply brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, Kathleen Cegla, Assistant Attorney General, and Leigh A. Salmon, Assistant Attorney General.

Daniel J. Casey, argued the cause for respondent-cross-appellant. With him on the briefs was Robert L. Huggins, Jr. Martin Allen Johnson filed the supplemental briefs *pro se.*

Before DeVore, Presiding Judge, and Flynn, Judge, and Haselton, Senior Judge.

FLYNN, J.

**FLYNN, J.**

This is a post-conviction case in which the court vacated the judgment in the underlying criminal case on the basis of inadequate and ineffective assistance of trial counsel, under Article I, section 11, of the Oregon Constitution and the Sixth and Fourteenth Amendments to the United States Constitution, and remanded the case for a new trial. The state[1] appeals, arguing that the post-conviction court erred in determining that counsel failed to adequately investigate a morphine overdose defense by not obtaining an expert opinion from a toxicologist, and that petitioner was prejudiced by his attorneys' inadequacy. Petitioner cross-appeals, contending that the post-conviction court erred in determining that the other claims alleged in his petition do not provide alternative bases for granting post-conviction relief. Because we agree with the post-conviction court's determination that petitioner was denied adequate representation, and that he was prejudiced as a result, we affirm on the appeal. We dismiss the cross-appeal as moot.[2]

The right to counsel guaranteed by Article I, section 11, and by the Sixth Amendment, is a right to "'adequate performance by counsel' concerning the 'functions of professional assistance which an accused person relies upon counsel to perform on his behalf.'" *Montez v. Czerniak*, 355 Or 1, 6, 322 P3d 487, *adh'd to as modified on recons*, 355 Or 598, 330 P3d 595 (2014) (quoting *Krummacher v. Gierloff*, 290 Or 867, 872, 627 P2d 458 (1981)); *see also Strickland v. Washington*, 466 US 668, 686, 104 S Ct 2052, 80 L Ed 2d 674 (1984) (United States Constitution requires not just counsel, but "effective" counsel). Oregon has a legislatively created post-conviction process that provides relief when there has been a "substantial denial" of the state or federal constitutional right to counsel, "which denial rendered the

---

[1] For clarity, we refer to defendant as "the state" throughout this opinion.

[2] Petitioner does not argue that any of his assignments of error on cross-appeal could provide relief different from the relief of a new criminal trial that the post-conviction court granted, and that we affirm. Moreover, we do not understand the court's denial of post-conviction relief on other claims to have any effect on the retrial of the case, or to preclude petitioner from relitigating any of the issues underlying those additional claims, which might arise in a different posture on retrial.

conviction void." ORS 138.530(1)(a). To prevail on a claim for post-conviction relief, a petitioner must "show, by a preponderance of the evidence, facts demonstrating that trial counsel failed to exercise reasonable professional skill and judgment and that petitioner suffered prejudice as a result." *Trujillo v. Maass*, 312 Or 431, 435, 822 P2d 703 (1991).

We review the post-conviction court's determination for errors of law. ORS 138.220; *Montez*, 355 Or at 8. In doing so, however, we are bound by the post-conviction court's findings of fact if they are supported by evidence in the record. *Id.* (citing *Lichau v. Baldwin*, 333 Or 350, 359, 39 P3d 851 (2002)). Moreover, "[i]f the post-conviction court failed to make findings of fact on all the issues—and there is evidence from which such facts could be decided more than one way—we will presume that the facts were decided consistent with the post-conviction court's conclusions of law." *Id.* The state does not challenge any of the post-conviction court's factual findings as unsupported by the evidence, and we therefore quote from those findings extensively.[3]

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Underlying Criminal Proceedings*

The investigation underlying this case "began at 6:30 a.m. on February 24, 1998, when a young woman's body was discovered in the surf on a beach near Warrenton. Within a few days, the Clatsop County Sheriff's Office positively identified the body as that of [the victim], a Portland-area teenager." Dr. Nikolas Hartshorne, a forensic pathologist and deputy medical examiner, concluded that the victim had died by strangulation.

After interviewing the victim's family and friends, investigators learned that the victim "had left her Washington County home around 2:30 a.m. on February 23, 1998, ostensibly to go to the home of her friend 'Marty' to play on his computer." Investigators found a telephone number for a

---

[3] The post-conviction court's factual findings are largely drawn from the Supreme Court's decision affirming petitioner's judgment of conviction and sentence of death on direct appeal. *State v. Johnson*, 340 Or 319, 131 P3d 173, *cert den*, 549 US 1079 (2006).

"Marty" in the victim's bedroom and learned that the number belonged to petitioner, whose first name is "Martin." A friend of the victim told investigators "that 'Marty' was an 'older guy' who always was 'hitting on' [the victim] and who sometimes provided [her] with alcohol and drugs."

Further investigation revealed that petitioner "was on probation for federal drug crimes, that he drove a black Acura with distinctive vanity plates, and that, at 1:54 a.m. on February 24, 1998, a police officer had stopped him as he drove south on Highway 30, a principal road between the Warrenton area and the Portland area (where [petitioner] lived)." A few days later, investigators executed warrants to search petitioner's home and car, and to obtain DNA samples from his person. That same day, investigators attempted to interview petitioner at the local sheriff's office, but petitioner cut the interview short and asked to go home. The next day, investigators learned that petitioner had absconded with his brother's car and credit cards, and that his whereabouts were unknown. Petitioner remained missing until police arrested him in Florida approximately one year later.

In the meantime, the murder investigation continued. Forensics technicians matched a bloodstain on the hatchback of petitioner's car to the victim's DNA. Investigators learned that petitioner "habitually preyed on underage girls, taking them to nightclubs, providing them with alcohol and drugs, engaging them in consensual sexual relations when possible and, most significantly, sexually abusing them while they were rendered unconscious by drugs that he had provided to them." Investigators also learned that the victim "had a significant amount of morphine in her system when she died and that her vaginal cavity contained semen whose DNA matched [petitioner's] DNA."

Based on that evidence, a Washington County grand jury issued an indictment alleging that petitioner had committed six counts of aggravated murder in Washington County. Petitioner told his defense lawyers that the victim died in Washington County from a drug overdose, that he found her "dead in bed and wrapped her body in a blanket, put her in the trunk of his car and drove her body to the coast and threw her in the water from the middle of the

Astoria Bridge." However, neither Hartshorne (the state's expert), nor the expert hired by the defense, provided an opinion regarding the victim's cause of death that supported petitioner's account of how and where the victim had died.

Shortly before trial, a grand jury issued a new indictment charging petitioner with additional counts of aggravated murder and alleging that petitioner had lived in, and had been extradited to, Washington County, thus implicating the presumptive venue provision of ORS 131.325. Under that statute, if it could not "readily be determined" where petitioner had committed the acts that caused the victim's death, venue would lie in Washington County, as petitioner's county of residence at the time of the offense or as the county to which petitioner had been extradited.[4]

The case proceeded to a jury trial, at which the state presented evidence that petitioner had previously drugged young women to the point of incapacitation and then taken advantage of them sexually. *See State v. Johnson*, 340 Or 319, 338-39, 131 P3d 173, *cert den*, 549 US 1079 (2006). The state used that evidence to support its argument that petitioner had done the same to the victim before killing her, and thus committed aggravated murder, ORS 163.095, by killing the victim "in furtherance of," or to conceal, the crimes of rape in the first degree and sexual abuse in the first degree. *Id.* at 339 n 12. Indeed, the state had "strong direct evidence" that the victim had had sexual contact with petitioner shortly before she died and a "high level of morphine" in her body. *Id.* at 339.

The focus of the defense at petitioner's criminal trial was on where and how petitioner killed the victim. The state relied on the expert testimony of Hartshorne, who "opined

---

[4] ORS 131.325 provides:

"If an offense is committed within the state and it cannot readily be determined within which county the commission took place, or a statute that governs conduct outside the state is violated, trial may be held in the county in which the defendant resides, or if the defendant has no fixed residence in this state, in the county in which the defendant is apprehended or to which the defendant is extradited."

As discussed below, the addition of the new language in the indictment alleging petitioner's place of residence and extradition features prominently in his claims of inadequacy of counsel. *See* 277 Or App at 231-32.

that the death was caused by strangulation in Washington County." The defense presented testimony from Dr. James Ferris, a forensic pathologist who had extensive experience performing autopsies on bodies recovered from water. Ferris opined that the victim's death was caused by drowning. The defense relied on Ferris "as the only expert, because of his opinion of the cause of death, [which] supported Petitioner's rather unique defense: failure of the state's case because the homicide occurred in the 'wrong' venue."

In other words, the sole defense presented at petitioner's criminal trial was that the victim was still alive when petitioner threw her into the Columbia River and, therefore, she died in Clatsop County, not Washington County as alleged in the indictment. As the post-conviction court found:

> "In such a case, despite the rather distasteful logical conclusion (and risky theme) that Petitioner threw a still living [victim] off the bridge causing her death by drowning, such a finding by the jury 'could' have supported the defense of the wrong venue, and thus, theoretically at least, a 'possibility' of acquittal."

The jury convicted petitioner of eight counts of aggravated murder, finding petitioner guilty of killing the victim "in furtherance of," and to conceal, the crimes of rape in the first degree and sexual abuse in the first degree.[5] *See Johnson*, 340 Or at 339 n 12. At the sentencing phase, the jury imposed the death penalty. Petitioner appealed, raising the challenges that could be raised on a direct appeal, and the Supreme Court affirmed petitioner's judgment of conviction and sentence of death. *Id.* at 319.

B.  *The Post-Conviction Hearing*

Petitioner then filed a timely petition for post-conviction relief. Among the many claims of inadequate and ineffective assistance of counsel that petitioner raised, through counsel and *pro se*, he argued that his trial attorneys failed to reasonably investigate a defense that the victim

---

[5] The trial court granted defendant's motion for a judgment of acquittal on Counts 3, 6, and 10 of the indictment on the basis that there was insufficient evidence of kidnapping, an element alleged in those counts.

had died of a drug overdose, instead pursuing only the venue defense based on the theory that the victim had died by drowning after petitioner threw her from the bridge in Clatsop County. Petitioner added that, as a practical matter, the venue defense became completely untenable once the prosecutor added the presumptive venue language of ORS 131.325 to the indictment, under which Washington County would become the proper venue if the jury found that it could not "readily" determine "within which county the commission took place."

As the post-conviction court found, "[t]here was little question that [the] victim (and Petitioner) [were] involved in drugs and sex prior to her death, but there were different possibilities presented as to how (where) [the] victim met her demise." (Footnote omitted.) One possibility was strangulation, the theory presented by the prosecution at the criminal trial through Hartshorne's testimony. Another possibility was drowning, the theory presented as petitioner's defense through Ferris's testimony. A third possibility was morphine overdose. Although no expert supported the overdose possibility during petitioner's criminal trial, "trial counsel was aware of Petitioner's belief and certain facts which supported that position, and Petitioner presented expert evidence at the PCR trial that overdose of morphine *was* the cause of death[.]" (Emphasis in original.)

Specifically, at the post-conviction trial, petitioner presented testimony from two experts that the victim could have, and likely did, die from a morphine overdose. Dr. Robert Julien, a retired clinical anesthesiologist, testified that the total level of morphine in the victim's body "was sufficient to cause cessation of respiration" and ultimately death, presuming the victim was nontolerant to opioid narcotics. In a report he prepared for the proceeding, Julien stated that it was "very likely that [the victim] died as a result of morphine overdose."

In addition, Dr. Janice Ophoven, a forensic pathologist, testified that, based on her training as a forensic pathologist and her experience in interpreting post-mortem toxicology, the victim's death was "consistent with morphine

overdose, which led to respiratory failure, pneumonia and death in a face-down position." She testified that the autopsy report did not reveal the classic signs of either strangulation or drowning. Ophoven testified, "I have conclusive evidence of a morphine overdose. I do not have evidence that she was [a]live in the water. I can't conclusively exclude it, but I would never say that was the cause of death."

At the post-conviction hearing, the state also presented an expert witness, Dr. Stuart M. Rosenblum. However, he was never asked for an opinion on whether the victim died by a morphine overdose, and he did not give an opinion on that matter at the hearing. Instead, Rosenblum, an anesthesiologist and pain-management specialist, testified more generally about the concepts of morphine lethality or survivability. He explained that there can be an overlap of a lethal level, an intoxicating level, and a therapeutic level of morphine. He stated that there are many factors—ranging from allergic reaction to high tolerance—that should be considered in determining the lethality of morphine use. Rosenblum testified that, assuming the victim was a "non-polydrug user," her ratio of free morphine to total morphine "would be a potentially survivable level of morphine."

## C. *Decision of the Post-Conviction Court*

The post-conviction court issued a general judgment deciding all of the issues presented at the post-conviction trial. The court denied the majority of petitioner's claims, but determined that petitioner had received inadequate and ineffective assistance of trial counsel, because his attorneys failed to sufficiently investigate a defense that the victim had died from a morphine overdose. The court, therefore, vacated petitioner's convictions for aggravated murder and remanded the case to the circuit court for a new criminal trial.

In its letter opinion, the post-conviction court found that petitioner's criminal defense counsel knew that the improper venue defense had little chance of success at trial and were also well aware of petitioner's belief that the victim

had died in Washington County. Specifically, the court found, with respect to the venue defense, that defense counsel "Peters testified that he didn't like it. He reached for an alternative which was also not particularly a 'tasteful' defense (accidental strangulation), which was rejected by Petitioner." The court further found that defense counsel Walker "knew that[,] unless Petitioner was quite mistaken over a period of some time and after close contact with the body handling it in different occurrences, it was likely as a fact that [the victim] was dead when she left Washington County." Counsel therefore "knew they had potential evidence that they were specifically ignoring if they chose the defense of drowning."

Moreover, the court found that counsel reasonably knew that, "even with [the] difficulties of presenting morphine overdose (for example, it might reasonably 'require' Petitioner to take the stand), *factually*, it *was* an option." (Emphases in original.) However, the court found, counsel made "little if any effort to follow up on any possibility of that defense." Instead, defense counsel "found a defense supported by an expert and which technically had a possibility to 'fly,' and [they] stayed with it, even when the presumptive venue language was added to the indictment making this position even less likely to prevail."

The post-conviction court determined that, although the improper venue defense was not "impossible," it was "unlikely in the extreme," because "there was virtually <u>little chance</u> that any jury would acquit upon Petitioner's defense which acknowledged that Petitioner killed [the victim]." (Underscoring in original.) The court noted that the jury "may have simply found that [the victim] was strangled" or "[i]t could just as easily be that they could not *readily determine* where the death occurred and if so, then venue, by statutory presumption, was in Washington County as alleged in the Amended Indictment based upon the residence of Petitioner." (Emphasis in original.) The court determined that, under those circumstances, "reasonably adequate trial counsel would have requested an additional opinion from a toxicologist" in order to investigate an alternative defense. The court explained:

"The point here isn't that trial counsel made an informed choice after due diligence toward being well informed on potential defenses, but that trial counsel limited the universe of options from which to make an informed decision by choosing not to consider hiring a toxicologist. Thus, trial counsel made the choice of defense without due diligence towards being informed. Under this scenario trial counsel did not make a reasonably informed decision on potential available alternatives."

(Footnote omitted.)

The post-conviction court also determined that petitioner was prejudiced by his attorneys' failure to consult a qualified expert to pursue a morphine overdose defense. The court found that there was "believable qualified expert evidence" that the victim died from a morphine overdose, and that that evidence was available to the defense at the time of petitioner's trial—*i.e.*, Julien was available to testify at petitioner's trial in 2001 and his testimony would have been the same as it was at the post-conviction hearing. The court concluded:

"Under these circumstances, trial counsel was constitutionally inadequate for not requesting the hiring of another expert (a toxicologist) to confirm or reject Petitioner's belief that [the victim] was dead before he found her with what he believed was rigor mortis and placed her in the trunk of his car and drove the body to the coast and threw it from the Astoria Bridge. Counsel should have requested and hired a toxicologist. There were no time constraints. Presumably the request would have been allowed and the cost would not have been unreasonable. Had they done so the result reasonably might have been different."

The state appeals from the judgment granting post-conviction relief, arguing that trial counsel's representation was not inadequate and that petitioner did not suffer prejudice as a result of his attorneys' decisions. For the reasons that follow, we reject the state's arguments and affirm the post-conviction court's judgment.

## II.  ANALYSIS

As the Supreme Court emphasized in *Montez*, "the standards for determining the adequacy of legal counsel

under the state constitution are functionally equivalent to those for determining the effectiveness of counsel under the federal constitution." 355 Or at 6-7. However, we first consider the state constitutional claim, and, "[i]f the petitioner prevails under Article I, section 11, we do not consider his claims under the Sixth Amendment." *Id.* at 7 n 3.

We apply a two-step process in evaluating petitioner's state constitutional claim of inadequate assistance of counsel under Article I, section 11:

> "First, we must determine whether petitioner demonstrated by a preponderance of the evidence that [his attorneys] failed to exercise reasonable professional skill and judgment. Second, if we conclude that petitioner met that burden, we further must determine whether he proved that [counsels'] failure had a tendency to affect the result of his trial."

*Id.* at 7 (internal quotation marks omitted). The state argues that the post-conviction court erred on both the performance and prejudice prongs in determining that petitioner received inadequate assistance of counsel.

As to the performance prong, the state argues that the post-conviction court erred in determining that counsel were constitutionally required to seek another expert opinion on the victim's cause of death after "[t]wo qualified experts told petitioner's counsel that morphine overdose was not the cause of death." The state appears to view the post-conviction court's decision as amounting to some sort of categorical determination about how many experts criminal defense attorneys are constitutionally required to consult (that is, something akin to a rule that "two are not enough"). As to the prejudice prong, the state argues that the post-conviction court erred because its determination failed to take into account the difficulties of presenting a defense of accidental overdose without petitioner's testimony at trial. We disagree with the state's characterization of the post-conviction court's analysis, and we conclude that the court did not err in determining that petitioner received constitutionally inadequate representation and that petitioner was prejudiced by that inadequate performance.

## A.  *Inadequate Performance*

The post-conviction court's determination that counsel failed to exercise reasonable professional skill and judgment by not adequately investigating the possibility of a morphine overdose defense is supported by evidence in the record and comports with the law governing such claims. As the Supreme Court has emphasized, the inquiry is necessarily circumstance-specific, not categorical:

> "[T]he failure to consider an issue or undertake a particular investigation does not automatically constitute inadequate assistance. However, the absence of strategic thought or direction on the part of a defense team can constitute inadequate assistance.
>
> "As *Montez* explains, whether the failure to consider an issue constitutes inadequate assistance will turn on, among other things, whether the strategy that defense counsel did employ was reasonable, the relationship between the evidence or theory that defense counsel failed to consider and the strategy that counsel did pursue, and the extent to which counsel should have been aware of the strategy that petitioner now identifies. * * *"

*Pereida-Alba v. Coursey*, 356 Or 654, 673-74, 342 P3d 70 (2015) (citations and internal quotation marks omitted).

Here, the post-conviction court found that (1) defense counsel knew that petitioner had a history of supplying women with drugs in order to engage in sexual activity with the women; (2) defense counsel knew about petitioner's belief that he found the victim dead in his home in Washington County, and that, if he were correct in that belief, the victim "did not die by drowning because she was already dead"; (3) an improper venue defense was "unlikely in the extreme" because "there was virtually <u>little chance</u> that any jury would acquit upon Petitioner's defense which acknowledged that Petitioner killed [the victim]" (underscoring in original); (4) defense counsel "had to know that it was very unlikely that a jury might acquit in such a circumstance, particularly if the jury had any reasonable basis for rejecting the 'defense'"; (5) defense "counsel knew there was another factual defense which was at least plausible even if it was difficult under the circumstances to prove"; (6) seeking an

additional opinion from a toxicologist to explore petitioner's description of the death would, "[a]t worst," have created the "possibility of either putting the issue to rest * * * or alternatively finding that there was an expert who would have given trial counsel another option as a defense: the option that Dr. Julian and [Dr.] Ophoven presented here"; and (7) "[c]ounsel made little if any effort to follow up on any possibility of that defense."

The post-conviction court determined that, under those circumstances, "trial counsel limited the universe of options from which to make an informed decision by choosing not to consider hiring a toxicologist. Thus, trial counsel made the choice of defense without due diligence towards being informed." We agree with the post-conviction court that, under those circumstances, petitioner did not receive constitutionally adequate representation.

Contrary to the state's assertion, we further conclude that counsels' decision to rely on Ferris's opinion and the venue defense was not a reasonable tactical decision deserving of deference. "[T]actical decisions made in the course of preparing for trial must involve 'a conscious choice by a lawyer either to take or to omit some action on the basis of an evaluation of the nature and complexity of the case, the likely costs and potential benefits of the contemplated action, and other factors.'" *Lichau,* 333 Or at 360 (quoting *Stevens v. State of Oregon,* 322 Or 101, 109, 902 P2d 1137 (1995)). Tactical decisions "must be grounded on a reasonable investigation." *Gorham v. Thompson,* 332 Or 560, 567, 34 P3d 161 (2001). "The question in each case is whether trial counsel's investigation was legally and factually appropriate to the case." *Id.* (citing *Stevens,* 322 Or at 108).

In *Lichau,* the Supreme Court determined that the petitioner did not receive constitutionally adequate representation when his defense counsel relied on an investigation conducted by the petitioner's former attorney and on inconclusive material provided by the prosecution, rather than conducting his own investigation of an alibi defense claimed by the petitioner. 333 Or at 361. Here, the post-conviction court found that petitioner's counsel "knew there

was another factual defense which was at least plausible even if it was difficult under the circumstances to prove," yet "made little if any effort to follow up on any possibility of that defense." As in *Lichau*, counsels' choice "to limit his investigation in that way was not 'based on a reasonable evaluation of the likely costs and potential benefits' to petitioner." *See* 333 Or at 361 (quoting *Stevens*, 322 Or at 109). We, thus, sustain the post-conviction court's determination that petitioner's defense counsel did not make "an informed choice after due diligence toward being well informed on potential defenses."

We also reject the state's suggestion that, as a matter of law, the failure to seek a third expert opinion on the cause of death cannot be constitutionally inadequate when two experts have already offered an opinion on that issue. The Supreme Court has emphasized that, in seeking to identify constitutionally adequate representation, "[t]he search for a single, succinctly-stated standard, objectively applicable to every case, is a fool's errand." *Krummacher*, 290 Or at 874. In that regard, we note that, here, the post-conviction court found that a request to hire a toxicologist would most likely have been granted because there would not have been any time or cost constraints associated with the request. Consequently, the cost of investigating an overdose defense would have been minimal while the benefit of pursuing the overdose defense could have been immense. In sum, the failure of petitioner's trial counsel to seek the opinion of a toxicologist was "not a choice that was based on a reasonable evaluation of the likely costs and potential benefits of pursuing the investigation" and, thus, not the exercise of reasonable professional skill and judgment. *See Stevens*, 322 Or at 109 (counsel's decision not to interview potential witnesses but to simply rely on the witnesses identified by the police was not a reasonable evaluation of the costs and benefits of pursuing the investigation). Thus, while we agree with the state that there is no categorical constitutional requirement that an attorney seek out a third expert opinion, we also sustain the post-conviction court's conclusion that, under the circumstances of this case, constitutionally competent counsel would have obtained an opinion from a toxicologist.

## B. *Prejudice*

Our analysis does not end, however, with our determination that petitioner's counsel failed to exercise reasonable professional skill and judgment in their investigation of the overdose defense. Post-conviction relief is available only if the court also correctly determined that petitioner suffered prejudice as a result of that substantial denial. *Montez*, 355 Or at 7. Prejudice means that the omission had "'a tendency to affect the result of the prosecution ***.'" *Lichau*, 333 Or at 365 (quoting *Krummacher*, 290 Or at 883).

The post-conviction court correctly determined that counsel's failure to adequately investigate the overdose defense had a tendency to affect the result of petitioner's trial. The evidence supports the post-conviction court's finding that Julien was available to testify at the time of petitioner's trial and could have provided "believable qualified expert evidence" that the victim died from a morphine overdose and not from strangulation. That finding was sufficient to establish prejudice. *See Lichau*, 333 Or at 364-65 (Supreme Court has never "held that evidence presented at a post-conviction hearing—evidence that could have been presented at petitioner's criminal trial—must be 'conclusive' to be deemed to have a tendency to affect the result of a trial"). That is, the "believable qualified expert" testimony regarding the possibility that the victim died from a morphine overdose would have had a tendency to affect whether the jury was convinced beyond a reasonable doubt that petitioner was guilty of the charged offenses.

We emphasize that petitioner was prejudiced by his attorneys' lack of due diligence even though evidence that the victim died of a morphine overdose might simply mean that petitioner caused the victim's death in a different way. Testimony from a toxicologist that the victim died from a morphine overdose would have allowed petitioner's defense counsel to argue that petitioner was guilty of a different offense—such as manslaughter, ORS 163.118(1)(a); criminally negligent homicide, ORS 163.145(1); or felony murder not committed intentionally, ORS 163.115(1)(b)—that, unlike aggravated murder, does not implicate the death penalty. Alternatively, the evidence could have allowed the

jury, even if it convicted petitioner of aggravated murder, to find that petitioner did not "deliberately" cause the victim's death, a finding that would result in a sentence of life imprisonment without the possibility of parole but not in a sentence of death. *See* ORS 163.150.[6]

We reject the state's contention that, given petitioner's refusal to testify at trial, he could not possibly have persuaded the jury of an overdose defense—and thus could not have been prejudiced by counsel's failure to pursue and present such a defense. Necessarily implicit in the court's determination that petitioner was prejudiced is the finding that counsel could reasonably have advanced a morphine overdose defense at trial. That finding is supported by the evidence. The record does not demonstrate that petitioner refused to testify under all circumstances, but rather that he declined to testify when the defense related to venue. Moreover, even if petitioner opted not to testify, counsel could have advanced a factual basis for the overdose defense simply from the evidence of morphine levels in the victim's body and potentially through the same evidence on which the state relied to establish petitioner's pattern of drugging women in order to sexually assault them. Thus, with or without additional evidence to explain the context for the drug overdose, we agree with the post-conviction court that expert testimony describing overdose as the cause of death would have a tendency to affect whether the jury would find that defendant intentionally, or deliberately, caused the victim's death. The court's findings of fact are supported by the evidence and establish that petitioner was denied constitutionally adequate representation of counsel, in violation of Article I, section 11, of the Oregon Constitution.

Affirmed on appeal; cross-appeal dismissed as moot.

---

[6] ORS 163.150 provides that, at the sentencing phase following a finding of guilt on aggravated murder, before the court may impose a sentence of death, the jury must find several factors established beyond a reasonable doubt, including that "the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result[.]"