Argued and submitted March 31, 2016, affirmed September 7, 2017

## ROBERT HOUSTON OWEN,
*Petitioner-Appellant,*

*v.*

## Jeri TAYLOR,
Superintendent,
Eastern Oregon Correctional Institution,
*Defendant-Respondent.*

Umatilla County Circuit Court
CV140346; A158253

404 P3d 1021

Jason E. Thompson argued the cause for appellant. With him on the brief was Ferder Casebeer French & Thompson, LLP.

Jonathan N. Schildt, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Paul L. Smith, Deputy Solicitor General.

Before Ortega, Presiding Judge, and Lagesen, Judge, and Garrett, Judge.

**LAGESEN, J.**

After becoming addicted to painkillers that were prescribed for an injury, petitioner went on a five month long crime spree consisting mostly of drug and property offenses. Although petitioner was apprehended and charged with the offenses he committed as the spree unfolded—leading to five different criminal cases against him—because the county jail did not have space available to hold him, he was not jailed pending resolution of those charges. His crimes continued until an incident that put the lives of three bicyclists at risk: Petitioner stole an Audi from a car lot and abandoned it in a field after it caught fire during a high-speed car chase that petitioner led through residential streets in Springfield. At that point—facing 40 charges in five different cases with the prospect of additional charges in at least one of the cases— petitioner, with the assistance of counsel, entered into a global resolution to settle the cases against him. He agreed to plead guilty to all 40 charges, in exchange for the state's agreement to cap its sentencing recommendation at 200 months' incarceration, to not file for aggravating factors in one of the cases, and its stipulation that petitioner would be eligible for alternative incarceration programs and earned time credits. The trial court accepted petitioner's plea and ultimately sentenced petitioner to 151 months' incarceration, rejecting both the state's recommendation (181 months) and petitioner's recommendation (60 months).

Petitioner sought post-conviction relief from those convictions and sentence. *See* ORS 138.510 - 138.680. He contended that the lawyer who assisted him in the global resolution of the charges against him rendered inadequate and ineffective assistance of counsel, in violation of his rights under Article I, section 11, of the Oregon Constitution and the Sixth Amendment to the United States Constitution, by not filing motions to suppress evidence in some of the five cases against him. The post-conviction court rejected that claim, concluding that, under the circumstances facing petitioner at the time he entered his plea, his trial counsel was not inadequate or ineffective for not filing the motions to suppress that petitioner now contends should have been filed. Because we agree with that conclusion, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

As noted, by the time he entered his plea, there were 40 charges pending against petitioner in Lane County. He accrued those charges as follows.

On December 1, 2011, petitioner was stopped for a traffic infraction. That stop led to a warrantless consent and then inventory search of petitioner's car. Those searches revealed heroin, methamphetamine, more than $300 cash, and six laptop computers, at least three of which were later confirmed to be stolen. Petitioner admitted that he was dealing heroin. This led to charges for two counts of first-degree theft, second-degree theft, unlawful delivery of heroin, unlawful possession of heroin, and unlawful possession of methamphetamine. Police continued to look into the ownership of the other three laptops, contemplating additional charges if they determined ownership.

Six days later, on December 7, 2011, petitioner was stopped for driving a vehicle with expired tags. After observing drug paraphernalia in the car, officers conducted a warrantless patdown and then consent search of petitioner, which revealed heroin, more than $300 in cash, and a scale. Petitioner consented to a warrantless search of his backpack, which revealed stolen property. Then, warrantless and consented-to inventory searches were conducted of petitioner's vehicle. Those further searches revealed more stolen property, including iPods, telephones, jewelry, and credit cards. This led to charges for two counts of first-degree theft and one count of unlawful possession of methamphetamine. Officers initially were unable to determine ownership of the property that petitioner possessed at the time of the stop, and continued to investigate, contemplating additional charges if ownership could be determined.

Two days later, on December 9, 2011, police officers contacted petitioner, who they located on the street, to follow up on a report that he had delivered heroin upon his release from custody on December 7. At the time, petitioner was pushing a high-end stolen bicycle and carrying a stolen computer bag. Petitioner consented to a warrantless search of the bag, which revealed a stolen laptop, heroin, bolt cutters,

and a stolen knife. Officers then found more stolen bicycles at petitioner's girlfriend's apartment, and other items they believed to be stolen. Petitioner admitted to police that he was dealing heroin. This led to charges for unlawful delivery of heroin, four counts of first-degree theft, and one count of second-degree theft. Because officers had been able to identify the owners of a small portion of property only, they continued to attempt to identify the owners of the property believed to be stolen, contemplating additional charges if ownership could be established.

By January 18, 2012, officers had developed probable cause to arrest petitioner for additional thefts related to the property that they had found in petitioner's possession in the December searches through their investigations into the ownership of that property. After observing petitioner driving on a suspended license, officers stopped him for that offense and then arrested him based on their probable cause that he had committed additional thefts in December. Officers then conducted a warrantless inventory search of his car. They found heroin, methamphetamine, multiple scales, drug paraphernalia, bolt cutters, and a large amount of property that appeared to be stolen. That property included wallets, gift cards, Oregon Trail cards in names not belonging to petitioner, watches, jewelry, bicycle parts, and a gaming system, among other things. Police also obtained and executed a warrant on petitioner's cell phone and discovered many messages about drug dealing and stolen property. Petitioner initially was charged with one count of unlawful possession of heroin. Officers launched an investigation to identify the owners of the various items that petitioner possessed, contemplating additional charges if they determined ownership.

Shortly thereafter, in early February 2012, officers received reports of the unauthorized use of a credit card belonging to the grandmother of petitioner's ex-girlfriend. The credit card was used 18 different times. Suspecting petitioner, officers were able to obtain video of 13 of the transactions. The video confirmed that petitioner was the person using the credit card. Although five of the unauthorized transactions were not captured on video, other

evidence (including the 13 transactions captured on video) tended to implicate petitioner. Based on that conduct, the state charged petitioner with four counts of identity theft for the unauthorized use of the credit card. The state, however, did not rule out charging petitioner with 18 counts of identity theft based on each separate transaction. Had the state charged the case in that manner, and had petitioner been convicted on each count, his sentencing exposure would have been 540 months under ORS 137.717, which governs sentencing for repeat property offenders.

About a month later, on March 9, 2012, petitioner was arrested on outstanding warrants. A packet of heroin was sticking out of petitioner's pocket, and petitioner admitted that he was carrying an illegally possessed knife. Petitioner also possessed stolen Visa gift cards, several other gift cards that appeared to be stolen, a check that appeared to be stolen, and drug paraphernalia. This conduct led to charges for unlawful possession of methamphetamine, unlawful possession of heroin, carrying a concealed weapon, and identity theft.

In mid-March 2012, petitioner was ordered to participate in a mandatory settlement conference related to his criminal cases. Although petitioner showed up in court for the conference, he told his lawyer that he needed to call his mother and then left the courtroom and fled. His lawyer looked for him, and his sister, who was present, tried to call him but without success. As a consequence, petitioner was charged with one count of failure to appear.

By late April 2012, petitioner again had several outstanding warrants and, on April 23, he was arrested on those warrants. In patting down petitioner, officers discovered a syringe. A warrantless inventory search of petitioner's backpack uncovered additional syringes, scales, 10 packets of heroin, and bolt cutters. After he was booked into jail, jail staff found another large bindle of heroin on petitioner's person. This led to one charge of unlawful delivery of heroin.

Released from jail, the final offenses in petitioner's spree took place in early May 2012. On May 3, 2012,

petitioner stole a truck from Interstate Batteries in Eugene. Store employees witnessed petitioner driving away in the truck and contacted police, who were able to track the truck through its "On-Star" vehicle tracking system. They found the truck parked and petitioner nearby. Police stopped and searched petitioner and found on him the keys to the stolen truck, heroin packets, the registration for the stolen truck, and two stolen wallets. Petitioner was arrested and handcuffed, but attempted to run away anyway. In so doing, he tripped over a planter and cut open his head. Because of the injury to his head, petitioner was not taken to jail. Instead, he was taken to the hospital, where he was cited and released. This set of events led to charges for unlawful use of a vehicle, unlawful possession of heroin, third-degree escape, and two counts of identity theft.

Finally, on May 6, 2012, a police officer observed petitioner driving an Audi A6 station wagon with no license plates and a window sticker reading "As Is No Warranty." Aware that a car matching that description had been stolen earlier that day, the officer initiated a stop of the Audi. Petitioner initially pulled over but sped away as soon as the officer got out of his own car. That started what became a lengthy high-speed chase through residential neighborhoods. Petitioner narrowly missed hitting three bicyclists. As he drove, sparks began to fly and eventually the car caught fire, at which point petitioner abandoned it in a field. Petitioner fled on foot from the car, which had become engulfed in flames, but was apprehended by a police dog that bit him on the leg. Petitioner was arrested, and heroin and syringes were found in his pockets. On the way to the hospital to secure treatment for his injuries, petitioner admitted to both vehicle thefts. This led to nine charges against petitioner: unlawful use of a vehicle, attempting to elude a police officer in a vehicle, reckless driving, three counts of reckless endangerment, second-degree criminal mischief, attempting to elude a police officer on foot, and unlawful possession of heroin.

Following the May 6 incident, petitioner was kept in custody, and the state and petitioner entered into negotiations to settle the cases by a global resolution. Petitioner did

not dispute that he had committed the crimes with which he was charged and wanted to negotiate the best deal possible, one which would resolve all pending charges and ensure that petitioner did not face new charges once in prison. In accordance with petitioner's wishes, trial counsel worked to negotiate a resolution of the cases. He did not seek to suppress any evidence because of petitioner's desire to work out the best deal possible, and because his review of the police reports caused him to doubt that he could successfully suppress the evidence found on petitioner during his multiple interactions with law enforcement.

The state proposed that petitioner plead guilty to all pending charges, in exchange for the state agreeing to cap its sentencing recommendation at 200 months, to stipulate to petitioner's eligibility for alternative incarceration programs and earned time credits, and to not seek additional aggravating factors for sentencing. Petitioner accepted that deal. At sentencing, the state urged the court to sentence petitioner to 181 months' incarceration, emphasizing in particular that petitioner's conduct came close to killing three people: "[I]t was just pure luck that he didn't nail these people." Petitioner, by contrast, argued that the court should impose no more than 60 months' incarceration, which, in petitioner's view, would permit him to obtain treatment to address his addiction. The court imposed a total of 151 months' incarceration.

Petitioner then filed this post-conviction proceeding. He alleged that his trial lawyer was inadequate and ineffective by not filing motions to suppress in connection with some of the charges against him. Specifically, petitioner alleged that trial counsel should have filed eight different motions to suppress evidence discovered in the various warrantless searches that transpired during petitioner's interactions with law enforcement:

(1) Trial counsel should have moved to suppress the evidence discovered during the December 1, 2011, searches of petitioner and his car;

(2) Trial counsel should have moved to suppress the evidence discovered in the December 7, 2011, searches of petitioner, his backpack, and his car;

(3)   Trial counsel should have moved to suppress the evidence discovered on December 9, 2011;

(4)   Trial counsel should have moved to suppress the evidence discovered during the January 18, 2012, inventory search;

(5)   Trial counsel should have moved to suppress the evidence discovered on March 9, 2012;

(6)   Trial counsel should have moved to suppress the evidence discovered in petitioner's backpack on April 23, 2012;

(7)   Trial counsel should have moved to suppress the evidence discovered on May 3, 2012; and

(8)   Trial counsel should have moved to suppress the evidence obtained from petitioner's person and vehicle on May 6, 2012.

For each of the motions that petitioner alleged should have been filed, petitioner identified various grounds for suppression that he thought were indicated by the police reports. Among other things, petitioner asserted that, to the extent that evidence was discovered in inventory searches, trial counsel should have moved to suppress on the ground that the Lane County Sheriff's inventory policy was overbroad and invalid. In support of this contention, petitioner relied on two cases: *State v. Hite*, 266 Or App 710, 338 P3d 803 (2014), and *State v. Davis*, 262 Or App 555, 325 P3d 790 (2014), both of which invalidated inventory searches on the ground that the Lane County Sheriff's inventory policy was impermissibly overbroad.

Petitioner also alleged that trial counsel should have argued that petitioner could not be convicted of escape for his conduct of running away from officers on May 3 because, in petitioner's view, he was not under lawful arrest.

Responding to petitioner's allegations in an affidavit, trial counsel explained that he did not file motions to suppress because petitioner's objective was to work out the best deal possible, and because "I believe my thought process would have been that in reviewing the cases, the motions would not have been successful. The police reports,

on the face [of] them seem to reflect that [petitioner] was subject to lawful arrest." The prosecutor corroborated trial counsel's version of events, explaining in his affidavit that, at the settlement conference that led to the plea deal, petitioner "had a strong desire to have all pending investigations resolved so that once in prison, he wouldn't have to worry about additional charges being filed in pending matters." Had the parties not reached a deal, "petitioner would likely [have] faced more charges had all of the matters gone before the grand jury for indictments." Petitioner also likely "would have received a lengthier prison sentence had he fought the charges" by filing motions to suppress. Among other things, "[a]ggravating circumstances would otherwise have been filed and provable" in connection with petitioner's use of the credit card belonging to the grandmother of his ex-girlfriend. Had the state done so, petitioner would have faced up to 240 months' incarceration on those counts alone, even if the state did not charge any additional counts of identity theft. And petitioner faced a genuine risk of being sentenced to that amount of time if he went to trial and was convicted. One offender with a criminal record comparable to petitioner's—repeat property offenses combined with a high-speed chase—was sentenced to 342 months' incarceration after losing at trial in Lane County. Further, if petitioner had filed the motions to suppress that he contends that trial counsel should have pursued, the prosecutor would have opposed them on the ground that there were multiple justifications for the warrantless searches of petitioner and his property and car, including "searches incident to arrest, automobile warrant exceptions," and others.

Crediting the affidavits from counsel and the prosecutor—in particular, the prosecutor's representation that he would have had bases to oppose petitioner's proposed motions to suppress if they had been filed—the postconviction court rejected petitioner's contention that trial counsel was constitutionally inadequate or ineffective for not filing multiple motions to suppress:

"The Petitioner has failed to understand what his attorney clearly did grasp: if a criminal defendant forces the ADA to the mats on all the original charges pending, then the state will add any credible additional charges, and seek the

maximum penalty on all convictions. Petitioner's circumstances is a classic example of the drug addled committing many crimes, with prosecution resulting for only some of them. Petitioner would have had to prevail on most or all of the suppression motions to have achieved a better outcome. That was a prospect that defense wisely saw as unlikely, and certainly not worth the risk."

Addressing explicitly petitioner's arguments that trial counsel should have moved to suppress the evidence discovered in the inventory searches on the ground that the Lane County Sheriff's inventory policy was invalid, the court observed that the two cases on which petitioner relied—both of which were reversals of trial court decisions—were decided well after petitioner entered his plea. Thus, the court reasoned, it would not have been readily apparent to trial counsel at the time of petitioner's plea that such a motion was likely to succeed:

> "From these decisions, decided two years after Petitioner pleaded guilty, he contends that his attorney should have filed motions to suppress, which he assumes would have been granted and dispositive of his charges. To contend that the law of inventory searches was well settled by the time of Petitioner's pleas is belied by the fact of these two reversals of trial court decisions in the span of seven months. The court concludes that Petitioner's attorney could not have been clairvoyant in assuming that the police reports he had conclusively demonstrated that he would have won all the motions to suppress."

Based on those conclusions, the post-conviction court denied relief. Petitioner appeals, assigning error to the post-conviction court's denial of relief on his claims that trial counsel should have filed one or more of the identified motions to suppress.[1]

## STANDARD OF REVIEW

We review the post-conviction court's denial of relief for legal error. *Green v. Franke*, 357 Or 301, 312, 350 P3d

---

[1] He also argues that the post-conviction court erred in denying relief on his claim that trial counsel was inadequate or ineffective for not arguing that petitioner could not be convicted for escape during the May 3 incident because, in petitioner's view, petitioner was not subject to a lawful arrest. We reject that contention without further discussion.

188 (2015). In conducting that review, we are bound by the post-conviction court's findings of historical fact if those findings are supported by the evidence in the record. *Id.* "If the post-conviction court failed to make findings of fact on all the issues—and there is evidence from which such facts could be decided more than one way—we will presume that the facts were decided consistently with the post-conviction court's conclusions of law." *Id.*

## ANALYSIS

On appeal, petitioner largely reiterates the arguments that he presented to the post-conviction court: that his trial counsel was inadequate and ineffective for not filing one or more of the eight motions to suppress that he has identified. He contends that a lawyer, exercising reasonable professional skill and judgment, would have identified a range of potential grounds for suppression and filed such motions under the circumstances of petitioner's case. He further contends that the motions, if filed, would have succeeded and, had the motions succeeded, petitioner would not have pleaded guilty but, instead, would have proceeded to trial. In response, defendant, the superintendent of the correctional institution where petitioner is incarcerated, asserts that petitioner's arguments overlook the fact that trial counsel's decision not to file the identified motions to suppress occurred in the context of plea negotiations. That trial counsel decided not to file the motions in that context is significant because, during that stage of the case, trial counsel was attempting to negotiate a favorable resolution of all the pending charges against petitioner and to avert additional charges and the addition of aggravating sentencing factors. Trial counsel's decisions regarding the potential motions to suppress, when viewed in light of the particular stage of the case and the circumstances under which they were made, were the product of reasonable professional skill and judgment. For the reasons that follow, we agree with the superintendent.

To establish that his trial counsel rendered inadequate assistance for purposes of Article I, section 11, petitioner was required to prove two elements: (1) a performance element: that trial counsel "failed to exercise reasonable

professional skill and judgment;" and (2) a prejudice element: that "petitioner suffered prejudice as a result of counsel's inadequacy." *Johnson v. Premo*, 361 Or 688, 699, 399 P3d 431 (2017). A functionally equivalent two-element standard governs petitioner's claim of ineffective assistance of counsel under the Sixth Amendment. *Id.* To prevail on that claim, petitioner was required to demonstrate that "trial counsel's performance 'fell below an objective standard of reasonableness,'" and also that "there was a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* at 700 (quoting *Strickland v. Washington*, 466 US 668, 694, 104 S Ct 2052, 80 L Ed 2d 674 (1984)). Here, we understand the post-conviction court to have denied relief on petitioner's claims based on its conclusion that he failed to prove the performance element of his claims. Accordingly, we focus our analysis on that element of petitioner's claims.

As noted, to satisfy the performance element of his claims under Article I, section 11, petitioner was required to demonstrate that trial counsel's decision not to file the motions to suppress that petitioner now claims should have been filed was not the product of reasonable professional skill and judgment. As the Supreme Court has recently reminded us, in evaluating a petitioner's claim, we must exercise "disciplined scrutiny" to avoid viewing counsel's performance through "the distorting lens of hindsight." *Id.* The need for such "disciplined scrutiny" is particularly important in a case like this one, where petitioner's underlying criminal case was resolved by a plea early in the litigation process. Similarly, the United States Supreme Court has observed:

> "In the case of an early plea, neither the prosecution nor the defense may know with much certainty what course the case may take. It follows that each side, of necessity, risks consequences that may arise from contingencies or circumstances yet unperceived. The absence of a developed or extensive record and the circumstance that neither the prosecution nor the defense case has been well defined create a particular risk that an after-the-fact assessment will run counter to the deference that must be accorded counsel's judgment and perspective when the plea was negotiated, offered, and entered."

*Premo v. Moore*, 562 US 115, 126, 131 S Ct 733, 178 L Ed 2d (2011).

Our task, then, is to examine the circumstances in which counsel made the challenged decisions and determine whether, under those circumstances, counsel's decision was one that a reasonable lawyer could make. *Cartrette v. Nooth*, 284 Or App 834, 841-42, 395 P3d 627 (2017). That task is complicated in this case because petitioner has not identified precisely *when* he thinks that trial counsel should have filed the identified motions to suppress. Based on the arguments that petitioner made at the post-conviction hearing and at oral argument before us, we consider two potential times: in May 2012, before engaging in plea negotiations and some unidentified earlier time.

To the extent that petitioner argues that trial counsel's decision not to file motions to suppress in May 2012, in advance of plea negotiations, was not the product of reasonable professional skill and judgment, we disagree. At that point in time, petitioner was charged with 40 offenses, more charges were possible, and petitioner himself desired to work out a plea agreement to limit his sentencing exposure and to avoid additional charges. Trial counsel's decision not to file motions to suppress was consistent with petitioner's goals.

Additionally, the benefits to petitioner of filing those motions were dubious for two reasons: (1) the motions likely would not seriously undermine the state's ability to prosecute petitioner for a significant set of crimes even if successful in some respect and (2) the likelihood of success was doubtful. On the first point, the superintendent points out that petitioner has identified no basis for suppressing evidence related to his unauthorized use of the credit card belonging to his ex-girlfriend's grandmother, a case on which the evidence against petitioner was particularly strong. On that case alone, petitioner was at risk of imprisonment for up to 540 months, if the state later opted to charge it as aggressively as it could by adding an additional 18 counts of identity theft connected to petitioner. Under those circumstances, trial counsel had little reason to think that moving to suppress evidence in other cases ultimately would improve petitioner's chances at a less onerous sentence. That

is particularly so in view of the fact that petitioner's conduct had escalated to the point that he was putting human lives at risk, something that would have indicated to trial counsel that neither the prosecutor nor the trial court would have much reason to treat petitioner with exceptional leniency.

On the second point, there is not much in this record to suggest that a lawyer in trial counsel's position would have reason to think that the motions to suppress ultimately would have been successful in any significant way. To be sure, the police reports indicate potential grounds for suppression of the evidence that may have been worth pursuing if the case went to trial in order to narrow the state's case against petitioner. However, the police reports also contain facts that would suggest to counsel that such motions, ultimately, would not succeed. In any event, nothing in the police reports clearly establishes that the various warrantless searches were without adequate constitutional justification, and the reports indicate a number of potentially applicable justifications for the searches. In hindsight, petitioner's greatest chance for suppression may have been of the evidence obtained in inventory searches under the Lane County Sheriff's policy that we determined was invalid two years after petitioner entered his plea. But as the post-conviction court correctly observed, at the time of petitioner's plea, those cases had not been decided and, as those two cases themselves indicate, Lane County judges were rejecting such challenges. Thus, at the time of petitioner's plea, counsel was not unreasonable to think that such a motion ultimately would not succeed as counsel evaluated whether to file a motion to suppress in advance of any plea negotiations.

Apart from being of questionable benefit to petitioner, pursuing such motions carried significant risks for petitioner. It would be apparent to a reasonable lawyer that engaging in the motions practice now contemplated by petitioner would have thwarted petitioner's attempts to work out a plea deal that minimized his sentencing exposure and his exposure to additional charges. Had trial counsel filed such motions, there is little reason to think that the prosecutor would have been amenable to negotiating the case

in the same way. Instead, the prosecutor likely would have brought additional charges against petitioner to strengthen the state's case and would have added additional aggravating sentencing factors. That expansion of the case would increase petitioner's sentencing exposure significantly, something that petitioner wanted to avoid. Under those circumstances, as the post-conviction court correctly concluded, counsel reasonably opted not to pursue the motions to suppress that petitioner alleges should have been pursued.

As mentioned, below and at oral argument before us, petitioner also argued that, if counsel's decision not to file such motions in May 2012 during plea negotiations was not unreasonable, counsel nonetheless acted unreasonably by not filing one or more of the identified motions earlier, before petitioner completed his crime spree. Petitioner asserted that reasonable counsel would have filed such motions as petitioner's crimes accrued (or at least before his crime spree ended), so as to provide petitioner greater leverage in the eventual plea negotiation or criminal trial that petitioner would face.

That argument fails for two related reasons. First, as explained, the legal standard governing petitioner's claims requires that counsel's performance be evaluated in view of the circumstances known to counsel at the time of the challenged act or omission. But, at the time the earlier charges against petitioner were filed, trial counsel did not know that petitioner would continue to amass the crimes that he did. Although in retrospect it may have been possible for counsel to take steps in the earlier cases that might have benefited petitioner once his crime spree was over (although on this record that possibility seems remote), the exercise of reasonable professional skill and judgment required by Article I, section 11, and the Sixth Amendment does not require a lawyer to anticipate petitioner's future crimes and plan around them in handling petitioner's existing cases. Again, a lawyer's judgment is gauged under the circumstances that exist at the time of that judgment, not in the light of future events.

Second, petitioner has not identified any particular earlier time at which he claims a reasonable lawyer would

have filed one or more of the identified motions to suppress and, likewise, has not developed the evidence regarding what was known to counsel at that time. Because petitioner has the burden of proving his claims, *Johnson*, 361 Or at 701, that deficiency in the record precludes petitioner from prevailing on his claims, to the extent those claims are predicated on the assertion that trial counsel should have filed the motions to suppress at some point in time before May 2012. Without a developed record as to the circumstances existing at the time that petitioner's lawyer acted or failed to act in the manner that petitioner now challenges, we are unable to conduct the "disciplined scrutiny" of the lawyer's conduct that *Johnson* holds is required. *Id.* at 700.

Based on the foregoing analysis, we conclude that the post-conviction court was correct to reject petitioner's state and federal constitutional claims of trial counsel inadequacy and ineffectiveness. We therefore affirm the judgment on appeal.

Affirmed.