Argued and submitted February 8, 2011, affirmed September 26, 2012

JOSEPH DANIEL DERSCHON,
*Petitioner-Appellant*

*v.*

Brian BELLEQUE,
Superintendent,
Oregon State Penitentiary,
*Defendant-Respondent.*

Marion County Circuit Court
07C17420; A143197

287 P3d 1189

James N. Varner argued the cause and filed the brief for appellant.

Inge D. Wells, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Before Armstrong, Presiding Judge, and Haselton, Chief Judge, and Duncan, Judge.

DUNCAN, J.

### DUNCAN, J.

In this post-conviction case, petitioner appeals from a judgment denying him post-conviction relief from 10 convictions arising from a home-invasion robbery.[1] Petitioner alleged that he was denied adequate assistance of trial counsel under Article I, section 11, of the Oregon Constitution and effective assistance of trial counsel under the Sixth and Fourteenth Amendments to the United States Constitution. Specifically, he alleged that his counsel was inadequate in failing to object to several hearsay statements, failing to present testimony of two witnesses, failing to timely object to a discovery violation, failing to consult and call an expert regarding cell phone records, and failing to move for a judgment of acquittal on one kidnapping count. We conclude that any errors that trial counsel made in the course of representing petitioner did not prejudice petitioner because the state introduced overwhelming evidence of petitioner's guilt apart from the contested evidence. Accordingly, we affirm.

We are bound by a post-conviction court's findings of fact if they are supported by evidence in the record, and we review its legal conclusions for errors of law. *Chew v. State of Oregon*, 121 Or App 474, 476, 855 P2d 1120, *rev den*, 318 Or 24 (1993). We begin by recounting, in some detail, the evidence that was adduced at petitioner's criminal trial as it is relevant to his post-conviction claims.

### State's Evidence

Kanewa and Smith lived together in a duplex in Springfield. Kanewa testified that, on November 13, 2002, at approximately 11:00 a.m., their doorbell rang. When she opened the door, two men were outside. One man had a moustache, and Kanewa later identified him as petitioner. The other man, later identified as Davis, pushed Kanewa inside, and both men entered. Davis held a gun to Kanewa's head and demanded that she tell him where she kept her money, jewelry, guns, and drugs.

---

[1] Petitioner was convicted of two counts of robbery in the first degree, ORS 164.415; two counts of robbery in the second degree, ORS 164.405; one count of burglary in the first degree with a firearm, ORS 164.225, ORS 161.610; two counts of kidnapping in the second degree, ORS 163.225; and three counts of theft in the first degree, ORS 164.055.

Smith, who was upstairs, heard the robbers enter the house. She retrieved a handgun and came down the stairs, pointing it at Davis. Davis knocked her down and took the gun from her. Petitioner bound Kanewa and Smith with duct tape and ordered them into the kitchen, where he kept watch while Davis ransacked the garage. Then petitioner ordered them into the bathroom, closed the door, and used something to block it closed. After the robbers left, the victims were able to get out of the bathroom. They discovered that jewelry, electronics, two DeWalt drills, cash, and personal identification were missing.

Kanewa and Smith reported the robbery to the police. That afternoon, Kanewa went to the police station and picked Davis out of a photo lineup. The next day, she picked petitioner out of another photo lineup. Smith testified that she could not say for certain that petitioner was one of the robbers, but she noticed that the second robber was about the same size as petitioner, had blond hair and a moustache, and tried to cover his face during the robbery.

The state also called Kramer, the victims' neighbor, who testified that he saw two men wearing hats loitering near his property around 10:30 a.m. on the day of the robbery. Just before noon he saw the men come out of the duplex carrying "a bunch of stuff," which they put into a black import sedan. Then they got into the car and drove off quickly. One or both of the men had facial hair, and petitioner's appearance was consistent with that of one of the men he saw.

A friend of Davis's, Nestor, testified that, about two weeks before the robbery, she and her partner had given Davis permission to park his trailer on their property and live there temporarily. While he was living there, Davis had occasionally used Nestor's car, a black Nissan Stanza sedan. On the morning of the robbery, Nestor came out of the house around 10:30 a.m., intending to leave in the car. Her car was not there, but she noticed an older-model black Corvette parked at Davis's trailer. No one was in the trailer. She called Davis twice, but he did not answer. She called him again around 11:00 a.m., and he told her that he could not return her car right away.

At 12:10 p.m., Nestor noticed that her car was back. The Corvette was still parked at Davis's trailer. She went to the trailer to express her anger that Davis had taken her car. Davis and a blond man with a moustache, whom she later identified as petitioner, were in the trailer, sorting through a large amount of jewelry.

After Davis was arrested, Nestor saw Owcarz, a friend of Davis's, going through Davis's things at the trailer. She described the man that she had seen with Davis to Owcarz and, based on her description of the man and the Corvette, Owcarz told her that the man was Jody. (Jody is a nickname that petitioner uses.)

Desler, a delivery driver, testified that, on the day of the robbery, he saw a black Nissan Stanza park at a convenience store across the street from the victims' home. Two men wearing fedora hats and sunglasses got out and "walked briskly across the street."

Owcarz testified that he had met petitioner a few times and that petitioner always had a moustache. On the afternoon of the robbery, Owcarz went to Davis's trailer. He saw the jewelry and Davis described the robbery to him. Davis did not say who the other robber was, but Nestor later told him that petitioner was the other robber.

On the evening of the robbery, Davis wanted Owcarz to drive him around town, but Owcarz did not want to be involved. He called the police and arranged to be pulled over with Davis in the car so that the police could arrest Davis. The arrest took place as planned, and Davis had Smith's credit cards and identification cards with him when he was arrested.

Coble, a former roommate of Davis's, testified that he had recently bought a television and two computers from Kanewa. He also testified that, after visiting the victims' home, he told several friends, including petitioner—but not Davis—about "an opportunity for a guy to buy some things at a reasonably cheap price" from the victims. According to Coble, there was "bad blood" between petitioner and Davis arising from a disagreement about a robbery in Junction City. The victim of that robbery was the new boyfriend of

petitioner's ex-girlfriend, and Coble testified that he had heard that petitioner had asked Davis to commit it.

The state called Davis as a witness, and he invoked his Fifth Amendment right to remain silent. Then Myers, the lead detective on the case, testified about a confession Davis had made to him. Among other things, Davis had said that Coble had told him about the victims and how easy it would be to rob them. He also said that, in payment for the tip, Davis had given Coble a gun and a video camera. At first, Davis refused to identify the second robber. However, Davis eventually admitted to another detective, Lewis, that petitioner was his accomplice.

After Kanewa identified petitioner in the photo lineup, the detectives looked for petitioner at his sister's house in Eugene. They found the Corvette there and learned from a neighbor that petitioner was inside. Myers knocked on the door several times and then called petitioner's sister's home phone and left several messages on the answering machine. After 30 to 40 minutes, petitioner answered the door. He had no moustache. His face was red and it appeared that he had just shaved. The state introduced several photographs of petitioner taken over the previous eight years; in all of them, petitioner had a moustache. While the detectives were taking petitioner to the police station, petitioner told Lewis that he had shaved his moustache "a while ago."

Myers also testified that he had been present in court when Davis pleaded guilty to the charges arising from the robbery, and Davis said that he had committed the crime with petitioner. Lewis also testified about Davis's statement that petitioner was the other robber.

Sullivan, a waitress who was acquainted with petitioner, testified that, on the evening of the robbery, petitioner came into the restaurant where she worked. He showed her a large stack of bills in his wallet.

Dowty, one of petitioner's friends, testified that, on the evening of the robbery, petitioner left some things, including a DeWalt drill, a knife, and a gun, at her house. Dowty's roommate, Russell, also testified. She heard petitioner tell Dowty that he had "tubs" of gold jewelry and

that she could have some of it. Dowty later told Russell that petitioner had left the drill and the gun at their house on the night of the robbery.

Kanewa testified again and explained that the robbers took $2,000 in a variety of bills from her bedroom. Also, she never recovered a DeWalt drill that was taken during the robbery.

## Defense Evidence

Petitioner raised an alibi defense. Petitioner's girlfriend, Steinmetz, testified that, on the day of the robbery, she dropped her son off at kindergarten at 11:05 a.m. Then she called petitioner, who promptly came to her house in Eugene and was in bed with her until 12:45 p.m. That evening around 5:00 p.m., petitioner spoke with her for about 25 minutes at the bar where she worked. Steinmetz had never seen petitioner without a moustache in the 13 years that she had known him.

Petitioner's own testimony about what he had done on the day of the robbery included meeting Steinmetz from approximately 11:00 a.m. to 1:00 p.m. He also testified that he had recently finished a concrete job McPherson. McPherson had paid him by check the week before the robbery, and petitioner had cashed the last check shortly before he was arrested.

Petitioner testified that he had realized that Davis planned to rob the victims after he heard Coble talking about the guns and electronics that the victims had and after Davis told petitioner that Coble was going to tell him where the victims' home was. Petitioner told Brewer, who was Coble's girlfriend and who had "police contacts," of the plan, with the intention of having Brewer warn the victims of the robbery and, perhaps, report the plan to the police. References to Brewer in the criminal trial transcript by petitioner's trial counsel indicate that Brewer was subpoenaed but failed to appear. She did not testify.

Petitioner explained the presence of his black Corvette at Davis's trailer on the morning of the robbery by testifying that, before he went to Steinmetz's house, he drove to Davis's trailer around 10:00 a.m. in order to ask Davis more about the planned robbery so that he could pass on the

details to Brewer. Davis was not there, so petitioner left his car at the trailer and walked to Coble's house, which was less than a block away. No one was home there either, so he left.

### Rebuttal Evidence

In rebuttal, the state called Ellis, who worked for Cricket Communications, a cellular telephone company. Ellis testified that petitioner's cell phone records demonstrated that, at the time of the robbery, petitioner was near cell tower 16, in Springfield (where the victims lived), rather than in Eugene (where petitioner claimed to have been with Steinmetz).

The jury convicted petitioner on all counts. On direct appeal, petitioner argued that the admission of the testimony of the two detectives about Davis's out-of-court statements implicating petitioner in the robbery violated his right to confront witnesses under the Sixth Amendment to the United States Constitution. *See Crawford v. Washington*, 541 US 36, 124 S Ct 1354, 158 L Ed 2d 177 (2004). This court concluded that the admission of the detectives' hearsay testimony was plain error, but we declined to exercise our discretion to review that error. We explained that "the gravity of the error in admitting the erroneous testimonial hearsay was insignificant." *State v. Derschon*, 206 Or App 574, 581, 138 P3d 30, *rev den*, 341 Or 312 (2006). That was so because

"[n]ot only did [Kanewa] positively identify defendant from two photo arrays, but a neighbor[, Kramer,] also testified to having seen a man matching defendant's description at the scene of the crime. [Nestor] observed defendant's car in her driveway while the home invasion was occurring, although no one was present in Davis's trailer during that time. Just after Davis returned home, [Nestor] entered Davis's trailer and saw defendant with Davis; together they were sorting through 'handfuls' of jewelry. Several witnesses testified that defendant had a prominent moustache on the day of the crime, and officers who apprehended defendant at his sister's house observed that, upon his delayed departure from the house, he appeared as though he had just shaved. Moreover, [Coble] had very recently told him of the trove of items that [Kanewa] had for sale in her home—information that, presumably, defendant then relayed to Davis.

"In light of the foregoing, we conclude that here, as in [*State v.*] *Galloway*[, 202 Or App 613, 123 P3d 352 (2005),

*vac'd on other grounds*, 345 Or 315 (2008)], the state has presented 'ample evidence of defendant's guilt over and above the evidence in the disputed *Crawford* hearsay.' [*Galloway*, 202 Or App] at 619."

*Id.* at 580-81.

Petitioner sought post-conviction relief, alleging that he was denied adequate assistance of counsel under Article I, section 11, of the Oregon Constitution and effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution.[2] He asserted, *inter alia*, that counsel was inadequate in failing to object to hearsay statements during the testimony of the two detectives, Coble, Owcarz, and Russell; in failing to call as witnesses Brewer and McPherson, whose testimony, he alleged, would have bolstered his case; in failing to timely object to a discovery violation regarding Ellis's testimony; in failing to retain and call a cell phone expert to discredit Ellis's testimony; and in failing to move for judgments of acquittal on the kidnapping counts.

At the post-conviction trial, petitioner presented affidavits from Brewer and McPherson. In her affidavit, Brewer asserted that she was available to testify at petitioner's trial and that she would have testified that, before the robbery, petitioner had told her that he believed that Coble and Davis planned to rob the victims, and that she had tried to warn the victims. McPherson's affidavit, along with copies of the checks that he wrote to petitioner, indicated that the last check he wrote to petitioner was in early October of 2002, more than a month before the robbery.

Petitioner also presented testimony from a cell phone expert indicating that, contrary to Ellis's testimony, although calls made from petitioner's cell phone around the time of the robbery activated cell tower 16, which is in Springfield, it was not impossible that those calls were made from Eugene rather than from Springfield. The expert also testified that some cell service records that were no

---

[2] Article I, section 11, provides, in part, "In all criminal prosecutions, the accused shall have the right * * * to be heard by himself and counsel[.]" The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defense."

longer available at the time of the post-conviction trial—and which, in his testimony, Ellis did not appear to have relied on—were crucial to determining whether petitioner's phone could have been in Eugene at the relevant time. The post-conviction court denied post-conviction relief.

Petitioner appeals the post-conviction court's judgment, renewing the arguments that he made below. We reject without further discussion petitioner's arguments regarding counsel's failure to object to hearsay by Coble, Owcarz, and Russell; failure to call McPherson; failure to timely object to the alleged discovery violation; and failure to move for a judgment of acquittal on one of the kidnapping counts.[3] We also reject petitioner's claim regarding counsel's failure to call Brewer because, as noted above, the trial transcript indicates that trial counsel subpoenaed Brewer, but she failed to appear. We do not understand petitioner to argue that counsel was required to do more than subpoena the witness. We also note that the references to Brewer in the trial transcript appear to contradict Brewer's statement, in the affidavit, that she was available to testify.

As to petitioner's remaining arguments—regarding the detectives' hearsay testimony and counsel's failure to call a cell phone expert—we conclude that any evidence that was improperly included in, or improperly excluded from, the body of evidence available to the jury as a result of deficiencies in trial counsel's performance had no tendency to affect the outcome of petitioner's criminal trial. As we noted on direct appeal, the state introduced "ample evidence of [petitioner's] guilt over and above" the evidence that petitioner disputed. *Derschon*, 206 Or App at 582 (internal quotation marks omitted). Although petitioner now disputes evidence in addition to that which he disputed on direct appeal, we conclude that, given the overwhelming evidence of petitioner's guilt, neither defense counsel's failure to object to the detectives' hearsay statements nor her failure to consult and present testimony of the cell phone expert had a tendency to affect the outcome of the trial.

_____

[3] At the post-conviction trial, petitioner expressly abandoned his claim regarding the second kidnapping count.

To establish ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments, a petitioner must prove that counsel's performance was unreasonable and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 US 668, 694, 104 S Ct 2052, 80 L Ed 2d 674 (1984). Similarly, to obtain post-conviction relief based on inadequate assistance of counsel under Article I, section 11, a petitioner must show, "by a preponderance of the evidence, facts demonstrating that trial counsel failed to exercise reasonable professional skill and judgment and that [the] petitioner suffered prejudice as a result." *Trujillo v. Maass*, 312 Or 431, 435, 822 P2d 703 (1991). To prove prejudice, the petitioner must establish that counsel's deficient performance had a "tendency to affect the result of the prosecution." *Stevens v. State of Oregon*, 322 Or 101, 110, 902 P2d 1137 (1995) (emphasis and internal quotation marks omitted); *Horn v. Hill*, 180 Or App 139, 148, 41 P3d 1127 (2002).

In making that determination, the court must consider "the totality of the circumstances." *Horn*, 180 Or App at 148 (internal quotation marks omitted). In doing so, "the question [for the court] is not simply whether counsel's failure had any negative effect regarding [a particular] issue. Rather, the question is whether the negative effect, if any, as to that issue in turn [tended to affect] the result in the proceeding as a whole." *Cunningham v. Thompson*, 188 Or App 289, 296, 71 P3d 110 (2003), *rev den*, 337 Or 327 (2004). As a result, in determining whether a given error had a tendency to affect the result of the prosecution, we consider "not only evidence presented in the post-conviction proceeding but also the record of [the] petitioner's criminal trial." *Id.* at 298.

As noted above, at petitioner's criminal trial, each of the detectives testified that Davis had stated that petitioner was the other robber. Trial counsel did not object to that testimony. Petitioner contends, and the state does not dispute, that those hearsay statements did not fall within any exception to the general prohibition on hearsay set

out in OEC 802. OEC 803; OEC 804. However, even if trial counsel's failure to object to the detective's hearsay testimony constituted a failure to exercise reasonable professional skill and judgment, petitioner was not prejudiced by it.

As we noted on direct appeal, the state presented "ample evidence" of petitioner's guilt apart from the detectives' testimony. *Derschon*, 206 Or App at 581. That evidence included (1) Kanewa's positive identification of petitioner as one of the robbers; (2) Kramer's testimony that a man matching petitioner's description was at the scene of the robbery; (3) Nestor's observation of petitioner's car at Davis's trailer, which was unoccupied, while Davis was using Nestor's black Nissan Stanza to commit the robbery and immediately thereafter; (4) Nestor's observation of petitioner and Davis in Davis's trailer with a large amount of jewelry just after Davis returned home; (5) the detectives' testimony that, when petitioner belatedly emerged from his sister's house, he had no moustache, appeared to have shaved very recently, and said that he had shaved the moustache "a while ago" (although Steinmetz, a defense witness, testified that petitioner had a moustache on the day of the robbery); and (6) Coble's testimony that he had told petitioner about the "trove of items that [Kanewa] had for sale in her home." *Id.* at 581. To that list of inculpatory evidence we would add Dowty's testimony that, on the night of the robbery, petitioner left a DeWalt drill, a knife, and a gun at her house, and Kanewa's testimony that a DeWalt drill was among the items taken during the robbery. In light of the quality and quantity of that evidence—including the fact that it came from several groups of unconnected witnesses—we conclude that the erroneous admission of the detectives' testimony that Davis had identified petitioner as the second robber did not have a "tendency to affect the result" of the trial, *Stevens*, 322 Or at 110, and did not create "a reasonable probability" of a different result, *Strickland*, 466 US at 694. *See Galloway v. Nooth*, 247 Or App 164, 185, 268 P3d 736 (2011) (in a post-conviction case, "adher[ing] to [our] conclusion," on the petitioner's direct appeal, that the admission of certain statements, while it was plain error, was not "'likely to have had an impact on the jury's verdict'" (quoting *State v. Galloway*, 202 Or App at 619-20)).

We come to the same conclusion regarding Ellis's testimony. With regard to counsel's failure to investigate the cell phone records and retain a defense expert, the post-conviction court concluded:

"[T]rial counsel should have done more than the record indicates was done in regard to this issue. Depending upon what the defense expert determined, trial counsel could have been better able to cross-examine the state's witnesses, to rebut the evidence through expert testimony, or [to determine] that the evidence was such that going forward with the alibi defense was not a good idea."

That is, if counsel had performed adequately, she would have been able to undercut the certainty of Ellis's conclusion that petitioner could not have been in Eugene at the time of the robbery. A defense expert could not have proved that petitioner *was* in Eugene, as he claimed, but could have undercut the persuasiveness of Ellis's conclusion that petitioner was not in Eugene by testifying that Ellis could not be certain of that conclusion based on the records available to him. Alternatively, the information that the expert provided might have indicated that petitioner's defense would have been stronger without the alibi testimony.

Nevertheless, proper investigation and presentation of expert testimony by trial counsel would not have had a tendency to affect the result of the proceeding. The evidence set out above—testimony from numerous witnesses that, together, positively identified petitioner as one of the robbers; placed him at the scene of the crime; placed his car at Davis's trailer at the time of the crime and immediately afterward; indicated that he had been with Davis immediately after the crime, sorting through the stolen property; showed that he had shaved his distinctive moustache on the day after the crime; showed that he knew that the victims had valuable items in their home; and indicated that he was in possession of property from the robbery—militated against the success of petitioner's alibi defense without regard to Ellis's testimony regarding petitioner's cell phone records. Counsel's failure to consult a defense expert who could have cast doubt on the certainty of Ellis's testimony locating petitioner in Springfield did not have a "tendency to affect

the result" of the trial, *Stevens*, 322 Or at 110, and did not create "a reasonable probability" of a different result, *Strickland*, 466 US at 694. *See Cunningham*, 188 Or App at 304 (affirming denial of post-conviction relief despite deficient performance by trial counsel at sentencing phase where "there was compelling evidence" on the point that the petitioner disputed); *Harris v. Morrow*, 186 Or App 29, 46, 63 P3d 581, *rev den*, 335 Or 479 (2003) (affirming the denial of post-conviction relief despite deficient performance by trial counsel where "there was * * * other overwhelming evidence of [the] petitioner's guilt").

Affirmed.