No. 514 June 10, 2026 373

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

MARCELLUS RAMON ALLEN,
*Petitioner-Appellant,*

*v.*

Jamie MILLER,
Superintendent,
Snake River Correctional Institution,
*Defendant-Respondent.*

Malheur County Circuit Court
22CV03503; A185685

J. Burdette Pratt, Senior Judge.

Argued and submitted May 7, 2026.

Lindsey Burrows argued the cause for appellant. Also on the briefs was Burrows Appellate Law LLC.

Rebecca M. Auten, Assistant Attorney General, argued the cause for respondent. Also on the brief were Dan Rayfield, Attorney General, and Benjamin Gutman, Solicitor General.

Before Tookey, Presiding Judge, Kamins, Judge, and Jacquot, Judge.

TOOKEY, P. J.

Affirmed.

**TOOKEY, P. J.**

Petitioner appeals a judgment denying post-conviction relief after his second trial for murder. The victim was shot nine times using three different guns, and the state's theory was that petitioner and two other members of a gang shot the victim. Petitioner argues that he received inadequate and ineffective assistance of counsel at his second trial. In his first assignment of error, petitioner argues that counsel's performance was deficient because counsel made inaccurate statements about what the evidence would show without having properly reviewed discovery. More specifically, during petitioner's opening statement, counsel stated that phone records would show that petitioner was not with one of the other shooters, Lomax, at the time of the shooting, but that claim was based on a misunderstanding of the phone records. Second, petitioner argues that trial counsel failed to preserve an objection to the admissibility of propensity evidence. The post-conviction court denied relief, and the superintendent maintains that the court did not err. We affirm.

First, we agree with petitioner that one of his trial attorneys failed to exercise reasonable professional skill and judgment when he told the jury during petitioner's opening statement that the phone records would show that petitioner was not with Lomax at the time of the shooting, which was based on a mistake about the phone records. Even so, when considered in the context of the other evidence presented during petitioner's second trial, petitioner has not shown prejudice; in other words, he has not shown that counsel's deficient performance could have tended to affect the outcome of the case because, as set forth below, the evidence that petitioner was one of three people who shot and killed the victim was overwhelming. *See Derschon v. Belleque*, 252 Or App 465, 466, 287 P3d 1189 (2012), *rev den*, 353 Or 208 (2013) (affirming denial of post-conviction relief and concluding that "any errors that trial counsel made in the course of representing petitioner did not prejudice petitioner because the state introduced overwhelming evidence of petitioner's guilt apart from the contested evidence").

Because petitioner fails to show prejudice, we affirm on the first assignment of error.

Second, we are not persuaded that it was unreasonable for trial counsel to fail to object to the admissibility of gang evidence and evidence of other shootings. In the trial court, defense counsel made a tactical decision to propose stipulations about petitioner's gang membership and then to object to much of the state's gang evidence as unnecessarily cumulative or prejudicial. Considered in that context, trial counsel was not deficient by failing to object to gang evidence as impermissible propensity evidence. *See Gorham v. Thompson*, 332 Or 560, 567, 34 P3d 161 (2001) ("It is well-established that a reviewing court will not second-guess a lawyer's tactical decisions in the name of the constitution unless those decisions reflect an absence or suspension of professional skill and judgment."). In addition, petitioner fails to show prejudice because he has not established that an objection to specific items of gang evidence on propensity grounds would have been successful. We therefore affirm the post-conviction court's denial of relief.

## I.  FACTS

On May 9, 2012, the victim, H, was shot nine times with three different guns. The state's theory was that petitioner was one of three people who shot and killed the victim, that the three persons were members of the same gang, and that they killed the victim because he was a competing marijuana dealer. On direct appeal after a second trial, we provided the following account of the facts:

"H had been in the business of selling medical marijuana to individuals, and he was known for selling high quality marijuana at about half the price of other sellers. According to the state's evidence, at around 11:30 p.m. on May 9, 2012, three men appeared at H's home, and someone knocked on the door. H's domestic partner, N, heard someone say they knew one of H's close friends and wanted to buy marijuana. H stepped outside and told N to go upstairs. As she did, she heard someone yell H's name and then 'a lot' of gunfire. N told the officers that she had looked through the peep hole to see a dark-skinned man wearing a red baseball hat on the front porch. Later that night, she told officers that the hat might instead have been white or

gray, but she maintained that the man was wearing a 'red top' or something red.

"An autopsy and ballistics analysis would later reveal that H had been shot nine times with three different guns. A criminalist also concluded from wounds that three guns were fired from different positions, indicating three shooters. Three kinds of bullets and casings were found at the scene and during the autopsy: .22 caliber, 9 millimeter, and .380 caliber.

"Soon after the shooting, police learned that three suspects were hiding in a nearby apartment. Police surrounded the apartment for several hours. Eventually, the officers took the three men into custody and searched the apartment. Among other items, officers found three guns—a .22 caliber revolver, a 9 millimeter handgun, and a .380 caliber handgun—that were later confirmed to be the three guns used to shoot H. (The state's theory would be that defendant used the .380 handgun.) Officers also found items of clothing. DNA testing connected two of those things to defendant: a red baseball hat with a white letter 'M' and a sweatshirt with the letters 'LRG'."

*State v. Allen*, 311 Or App 454, 455-56, 489 P3d 1075, *rev den*, 368 Or 702 (2021) (*Allen II*).

All three of the alleged shooters were tried together in 2014, and a jury found all three of them guilty of murder. Petitioner appealed, and we reversed and remanded for a new trial because the trial court erred in failing to suppress evidence discovered using a search warrant of petitioner's cell phone that was overbroad. *State v. Allen*, 288 Or App 244, 249, 406 P3d 89 (2017) (*Allen I*). On remand, Lomax and Riley pleaded guilty, but petitioner did not, and he exercised his right to have the case re-tried within 60 days. At his second trial in 2018, another jury found petitioner guilty of murder, and, on direct appeal, we affirmed. *Allen II*, 311 Or App at 456.

Petitioner sought post-conviction relief raising claims of inadequate and ineffective assistance of counsel, including claims based on counsel's mistake about the phone records and the failure to object to the admissibility of propensity evidence. The post-conviction court denied relief, and petitioner appeals.

## II.  ANALYSIS

A criminal defendant has the right to adequate and effective assistance of counsel under Article I, section 11, of the Oregon Constitution and under the Sixth and Fourteenth Amendments to the United States Constitution. *Antoine v. Taylor*, 368 Or 760, 767, 499 P3d 48 (2021). A violation of those rights entitles a petitioner to post-conviction relief. ORS 138.530(1)(a). Under the Oregon Constitution, to succeed on a claim of inadequate assistance, a petitioner must establish by a preponderance of the evidence that "counsel failed to exercise reasonable professional skill and judgment, and that the petitioner suffered prejudice as a result of counsel's inadequacy." *Johnson v. Premo*, 361 Or 688, 699, 399 P3d 431 (2017). "A functionally equivalent two-element standard governs petitioner's claim of ineffective assistance of counsel under the Sixth Amendment." *Smith v. Kelly*, 318 Or App 567, 568-69, 508 P3d 77 (2022), *rev den*, 370 Or 822 (2023).[1]

To show prejudice from inadequate assistance, the petitioner must show that counsel's deficient performance had "a tendency to affect the result of his trial." *Johnson*, 361 Or at 699 (internal quotation marks omitted). That standard "demands more than mere possibility, but less than probability." *Green v. Franke*, 357 Or 301, 322, 350 P3d 188 (2015). "In making that determination, the court must consider the totality of the circumstances." *Derschon*, 252 Or App at 474 (internal quotation marks omitted). In doing so, the question for the court "is not simply whether counsel's failure had any negative effect regarding a particular issue. Rather, the question is whether the negative effect, if any, as to that issue in turn tended to affect the result in the proceeding as a whole." *Id*. (internal quotation marks and brackets omitted).

When the post-conviction court denies relief on a claim of inadequate assistance of counsel, we review for errors of law. *Green*, 357 Or at 312. In doing so, we are bound by the post-conviction court's findings of historical

---

[1] Although the case law tends to refer to a defendant's right to "adequate" assistance of counsel when discussing the state constitution, and to "effective" assistance of counsel when discussing the federal constitution, here we use the term adequate assistance as a shorthand for both adequate and effective assistance of counsel.

fact so long as there is evidence in the record to support them. *Id.*

A.  *The post-conviction court erred in determining that trial counsel provided adequate assistance, but it did not err in determining that trial counsel's mistake did not prejudice petitioner.*

In the post-conviction court, petitioner pointed out that, at the second trial, defense counsel made a claim to the jury without having reviewed discovery to confirm that he could deliver on that claim. More specifically, counsel told the jury that the phone records would show that petitioner was not with one of the other shooters, Lomax, when the shooting occurred. But that was based on a misunderstanding that there had been two phone calls between petitioner and Lomax at 11:38 p.m., when in fact the calls were made at 11:38 a.m.

In considering whether that mistake amounted to inadequate assistance of counsel, the post-conviction court ruled that it did not. The court stated:

"There is no dispute that in his opening statement, [trial counsel] did appear to confuse 11:38 a.m. with 11:38 p.m., but as explained below, this is not because of inadvertence to detail or neglect, but because all five attorneys and a police detective present for petitioner's 2013-2014 trial, including the assigned prosecutors, made the same error and the entire 2013-2014 trial transpired without any attorney in the room realizing that the [phone records] actually indicated that petitioner was making texts and/or phone calls to his co-defendant at 11:38 a.m. instead of 11:38 p.m. The mistake appears to have originated from [a] District Attorney Investigator ***, who first mistakenly testified at trial that there was cell phone activity between co-defendants at 11:38 p.m. Petitioner has not proven that all reasonable trial attorneys would have caught the error. Five attorneys in the first trial did not.

"Petitioner also failed to prove prejudice. During the first trial, the evidence before the jury was that the phone call was made at the same time as the murder, yet petitioner was still convicted. As soon as [the prosecutor] caught the mistake that the [phone records] indicated cell phone activity at 11:38 a.m. instead of 11:38 p.m., he brought this

mistake to [defense counsel's] attention, providing him with an opportunity to correct it. Petitioner's defense did avail themselves of the opportunity to correct the mistake in a few instances during the 2018 re-trial. *** [The attorneys for both the state and the defense] addressed the mistake during their respective cross-examination and redirect of [the] DA investigator ***. By the prosecutor also 'owning' the mistake, this likely negated any loss of credibility to [defense counsel], since the jurors were provided with a compelling explanation for why [defense counsel] made the mistake directly from the prosecutor. The issue was also addressed during closing."

Regarding the first element of a claim of inadequate assistance, unlike the post-conviction court, we think that trial counsel's performance fell short of the constitutional standard, and that it was not reasonable to make a claim to the jury during petitioner's opening statement without having verified that the phone records supported the claim. Defense counsel argued during petitioner's opening statement that "forensic evidence" would show that petitioner was not with Lomax at the time of the shooting, and that "[t]he phone does not lie." We think it was unreasonable for trial counsel to make those claims without having checked whether the phone records supported them. *See Rudnitskyy v. State of Oregon*, 303 Or App 549, 556, 464 P3d 471 (2020) ("to show that counsel's performance was constitutionally inadequate, *** petitioner must show that any reasonable attorney would have taken the steps that petitioner now asserts his attorney should have taken"); *see also Myers v. Neal*, 975 F3d 611, 621 (7th Cir 2020), *cert den*, ___ US ___, 141 S Ct 2507, 209 L Ed 2d 540 (2021) (explaining that "[m]aking false promises about evidence in an opening statement" was "a clear instance of deficient performance").

We are cognizant that the constitutional standard "allows for tactical choices that backfire, because, by their nature, trials often involve risk." *Johnson*, 361 Or at 702 (internal quotation marks omitted). Here, defense counsel relied on sworn testimony from the first trial, and counsel's preparation for the second trial may have been somewhat rushed given petitioner's exercise of his right to a speedy trial. Nevertheless, when defense counsel relied on an

argument in his opening statement about what the phone records would show, we think that any reasonable attorney would have checked the records. Indeed, when petitioner's attorney made the claim, the prosecutor was able to identify the error relatively quickly, which suggests that it would not have been burdensome for petitioner's attorney to also check the phone records, rather than relying on what others had said about them. *See Farmer v. Premo*, 363 Or 679, 690, 427 P3d 170 (2018) (for a tactical decision "to be considered an exercise of professional skill and judgment, [it] must be grounded on a reasonable investigation" (internal quotation marks and citation omitted)).

Nevertheless, turning to the second element of a claim of inadequate assistance, we conclude that the post-conviction court did not err in determining that petitioner failed to show prejudice. Although the mistake might have made the jury somewhat more distrustful of petitioner and his attorneys, we think that its impact must have been minor in relationship to the whole trial. *See Derschon*, 252 Or App at 474 (in assessing prejudice from inadequate assistance of counsel, the court must consider the totality of the circumstances). To explain why, we summarize additional facts presented to the jury during petitioner's second trial.

At the time of the shooting, two officers from a K-9 unit happened to be training a dog nearby when they heard the gunshots. One of them saw a car enter an apartment complex without its headlights on. The officers saw three people walk away from the car, but the officers lost sight of them. The officers used the dog to track their scent, which led them to an apartment in which two women lived, Fair and Watson.

Believing that the persons in the apartment may have been involved in a shooting, the officers set up a perimeter around the apartment. Fair's mother came to the scene and worked with officers to get Fair, Watson, and Fair's baby out of the apartment. The three men eventually left the apartment and were taken into custody. When police searched the apartment, they found three guns. An autopsy and ballistics analysis revealed that those guns were used to shoot the victim.

During the second trial, the state offered evidence from Fair, who lived in the apartment where the three men had gone after the shooting.[2] Fair admitted that, on the night of the murder, she drove petitioner, Lomax, and Riley to the victim's home to buy marijuana. When they arrived, petitioner, Lomax, and Riley got out of the car and walked away. It was around 11:30 p.m. A few minutes later, Fair heard gunshots, and she saw the three men running back to her car. They got in the car, and petitioner told Fair to "Go, go, go." Petitioner told Fair to turn off the lights on the car, and she drove them back to her apartment. Fair went inside, and the three men stayed outside for a minute or two before also going inside.

When the police searched Fair's apartment, they found three guns. It was later determined that they were the guns used to shoot the victim. Based on the nature of the victim's wounds, a criminalist testified that the three guns were fired from different positions, indicating three shooters. *Allen II*, 311 Or App at 456.

One of the three guns recovered was a .380-caliber handgun, and the state offered evidence connecting that gun to petitioner. Police found a bag of .380-caliber bullets in Fair's apartment, and Fair testified that she had seen petitioner take it out of his pocket while he was in her apartment after the shooting. The same gun had been used in four shootings in the City of Portland in prior months. There was evidence that two of those shootings were by members of the "Hoover" gang, which was a gang that petitioner was affiliated with. Indeed, there was evidence that petitioner and some members of the Hoover gang formed a subset, or "clique," of the gang called HMF.

The state offered evidence that petitioner was wearing red on the night of the murder, which was consistent with a description of the person seen by the victim's domestic partner. In Fair's apartment, police found a red baseball cap and a sweatshirt with a red stripe on it. The sweatshirt had been soaked in Pine-Sol. In his testimony, petitioner

---

[2] At petitioner's second trial, Fair testified that she no longer had any memory of the incident, so police played an audio recording of her testimony from the first trial.

admitted that he was wearing the baseball cap and sweat-shirt on the night of the shooting, and there was also evidence that Lomax and Riley were not wearing red clothes that night.

While he was in custody following the murder, petitioner offered an inmate $10,000 to kill Fair, telling the inmate that, without Fair's testimony, the state "couldn't prove him guilty * * * of anything." Petitioner told the inmate that he and two others shot at the victim, but petitioner did not know which shots had hit the victim.

Another inmate also testified that petitioner confessed to him that petitioner had shot the victim.[3] According to the second inmate, petitioner said that Fair drove him to the victim's house and, when the victim came outside, petitioner shot him. Petitioner said he got back in the car, went to Fair's house, and he "tried to change his clothes * * * and wipe off the pistol."

In reviewing the evidence, we recognize that "we must be cautious about saying that the state's evidence was so strong as to preclude any significant chance of acquittal, regardless of counsel's performance." *Mitchell v. State of Oregon*, 300 Or App 504, 515-16, 454 P3d 805 (2019) (internal quotation marks omitted). Even so, considering the evidence presented during the second trial, we are not persuaded that trial counsel's mistake about the time of the phone calls could have tended to affect the outcome. *See Derschon*, 252 Or App at 476-77 (concluding that trial counsel's error did not affect the result because there was ample evidence of the petitioner's guilt).

Here, there is no dispute that petitioner was with Lomax and Riley on the night of the murder. Instead, petitioner testified that when they parked down the street from the victim's house, only Lomax and Riley went to the house, while petitioner stayed by the car. But that account is contradicted by Fair's testimony, who testified that all three of them walked away from her car and minutes later she heard gunshots and then saw the three of them running back to

---

[3] Like Fair, the second inmate also did not remember speaking with petitioner, so the state played an audio recording of his testimony from the first trial.

her car. It is contradicted by the testimony of the victim's domestic partner, who saw someone on the porch wearing red and DNA evidence connected petitioner to the red base-ball cap. Indeed, petitioner admitted that he was wearing the cap and sweatshirt that evening, and he testified that he gave the sweatshirt to Riley to soak in Pine-Sol while at Fair's apartment.

Petitioner claimed that he did not participate in the shooting, and the defense theory was that Riley must have used two guns, but that account was inconsistent with the testimony of a criminalist, who explained that, based on the victim's wounds, three guns were fired from different positions, indicating three shooters. And Fair testified that she saw petitioner with a bag of .380-caliber bullets in her apartment, which is the caliber of one of the guns used to shoot the victim, and that gun was used in other shootings by members of the same or related gangs.

There was evidence that petitioner sold marijuana as a source of income, and although he testified that he did not sell marijuana in Oregon, the fact that he sold mari-juana was relevant to whether he had a motive to kill the victim, who was purportedly selling marijuana at a low price. And perhaps most damaging, petitioner offered an inmate $10,000 to kill Fair. On the stand, petitioner acknowledged that he had said some "angry things" to the inmate about Fair because, according to petitioner, Fair had lied about peti-tioner's involvement in the murder. At his second trial, peti-tioner sought to discredit the inmate's testimony,[4] but peti-tioner never denied offering the inmate money to kill Fair. Indeed, petitioner admitted that a jury in a prior proceeding had found him guilty of attempted aggravated murder, in part based on his "conversations" with the inmate about Fair. Although petitioner also sought to discredit the testimony of a second inmate, who claimed that petitioner had also con-fessed to him, that was additional evidence supporting the state's theory that petitioner was one of the shooters.

In assessing the prejudice caused by the mistake about the phone records, we think it is also relevant that the

---

[4] The inmate had testified that petitioner told him the victim had been "pistol-whipped," but the medical evidence did not show that.

parties sought to address the mistake during the second trial. The state called the investigator as a witness during the second trial, and she explained that she had made a mistake during her testimony in a prior proceeding. And petitioner explained that when he heard the investigator's testimony in the prior proceeding, petitioner had mistakenly recollected that he had received calls at 11:38 p.m. because of all the "running and commotion" around the time of the shooting.

Thus, we accept that it was a mistake for petitioner's attorney to claim during petitioner's opening statement that the phone records would show that petitioner was not with Lomax at the time of the shooting. But we are not persuaded that the time of the two phone calls was, as petitioner suggests, "the central defense theory." For example, during petitioner's opening statement, defense counsel also sought to explain petitioner's gang membership, and defense counsel also tried to discredit the testimony of Fair and an inmate, to argue that Riley had used two guns because one of the other guns had jammed, and to argue that petitioner did not sell marijuana in Oregon.

Indeed, considered in the context of the trial as a whole, whether there had been two phone calls between petitioner and Lomax at the time of the murder was an ancillary issue, as shown by the fact that the first jury found petitioner guilty of murder even accepting that those calls had been made. And it is not surprising that the prosecutor would seek to capitalize on defense counsel's mistake after it was discovered during the second trial. Nevertheless, when we consider the mistake in relation to the ample other evidence presented during the second trial, including evidence showing that petitioner was with Lomax and Riley on the night of the murder, that petitioner was wearing red, that three guns had been used to kill the victim, that petitioner had bullets matching the caliber of one of the guns, and that petitioner had offered an inmate money to kill Fair, we conclude that counsel's deficient performance could not have tended to affect the jury's determination that petitioner was guilty of murder. *See Moser v. Lampert*, 200 Or App 78, 83, 112 P3d 482, *rev den*, 339 Or 406 (2005) (determining, in a post-conviction case, that the presence or nonpresence of

certain testimony would not have changed the jury's verdict given other overwhelming evidence presented at trial). The post-conviction court did not err in determining that petitioner failed to show prejudice, and we affirm on that basis.

B.   *The post-conviction court did not err in determining that trial counsel did not provide inadequate assistance by failing to preserve an argument about the admissibility of propensity evidence.*

Turning to petitioner's second assignment of error, petitioner argues that "his trial counsel rendered ineffective assistance by failing to challenge the propensity bases for admission of other-acts evidence." To place that argument in context, we begin with an account of what occurred during petitioner's second trial.

At his second trial, the court addressed arguments about the admissibility of evidence of petitioner's gang affiliations and prior shootings involving the .380 caliber handgun. *Allen II*, 311 Or App at 457. Petitioner offered to stipulate "that he was a member of a gang, that he knew the other two suspects as fellow gang members, and that the .380 handgun had been in the possession of another gang member about ten days prior to H's murder." *Id.* Petitioner argued that, given those stipulations, much of the state's evidence regarding his gang affiliations would be cumulative and unduly prejudicial. *Id.* For example, he challenged the admissibility of photos of his tattoos, a photo of petitioner wearing the red hat, and photos of petitioner and one of the shooters displaying gang signs. *Id.* Although the trial court limited some of the evidence relating to petitioner's gang membership, it ruled that most of it was relevant and admissible. *Id.* at 458.

On direct appeal, we affirmed, determining that the trial court did not abuse its discretion in admitting the evidence under OEC 403. *Allen II*, 311 Or App at 458-59. Despite petitioner's offers to stipulate,

"[t]he state provided an explanation for each item of evidence detailing why the probative value went beyond that of defendant's proposed stipulated facts. According to the state, its proffered evidence demonstrated the extent of defendant's commitment to the gang, his commitment to a

specific subset of the gang, the depth of his relationship with the other suspects, the improbable prospect that defendant was just an innocent bystander, his financial interest in the gang, and the likelihood that defendant himself procured the gun through the gang. As to each matter, the trial court found that the state had carried its burden of establishing that the challenged evidence retained probative value beyond the simple facts in defendant's stipulations."

*Id.* at 462 (footnote omitted). We also affirmed the trial court's determination that the probative value of each item of evidence was not outweighed by the danger of unfair prejudice. *Id.* at 463.

In addition, on direct appeal, we rejected as unpreserved petitioner's argument that the challenged evidence was inadmissible propensity evidence. *Id.* at 459. We explained that, in the trial court, petitioner's "arguments were limited to whether his proposed stipulations rendered the other evidence impermissibly prejudicial." *Id.*

In the post-conviction court, petitioner argued that trial counsel was deficient by failing to preserve the issue of whether the evidence was inadmissible because it relied on propensity reasoning. The post-conviction court denied the claim:

"Petitioner did not prove that his trial attorney failed to exercise reasonable professional skill and judgment in failing to adequately preserve for appeal a meritorious propensity evidence issue. The petitioner has not proven that the evidence in question was offered for propensity purposes. At trial, Petitioner conceded that some of the challenged photos were relevant. They were admissible for purposes beyond showing Petitioner's gang membership. The Court of Appeals held that the additional photos were admissible for purposes not covered by the stipulation and thus were properly admitted. Petitioner did not prove that all reasonable trial attorneys would have objected to the photos as improper propensity evidence.

"Petitioner has also failed to prove prejudice. Petitioner has not proven that an objection to the evidence based on the allegation that it was improper propensity evidence would have had merit either at the trial court or on appeal."

On appeal from the post-conviction court, petitioner argues that "[a]t least some of the challenged evidence relied on impermissible propensity reasoning and would have been inadmissible, had petitioner properly objected." For the reasons explained below, we are not persuaded by that argument.

On appeal, petitioner's arguments concern two categories of evidence: (1) the evidence of four prior shootings using the .380 caliber handgun, and (2) evidence of petitioner's gang affiliations more generally, including photos of petitioner.

Starting with evidence of the prior shootings using the .380 caliber handgun, we do not agree with petitioner's argument that defense counsel should have objected to the evidence on propensity grounds because the evidence was not "other acts evidence." OEC 404(4) provides that, in criminal cases, evidence of "other crimes, wrongs or acts *by the defendant*" is generally admissible if relevant. (Emphasis added.) Here, there was no suggestion that petitioner was the shooter in the prior incidents involving the .380 caliber handgun, so that evidence was not "other acts evidence" within the meaning of OEC 404(4). Instead, evidence of the prior shootings, at least two of which involved associates of petitioner, was used to show how petitioner gained access to the handgun. *Allen II*, 311 Or App at 457.[5]

Turning to petitioner's contentions regarding evidence of his gang affiliations more generally, including photos of petitioner, we conclude that petitioner fails to demonstrate that it was unreasonable for his attorneys not to object to that evidence as relying on propensity reasoning. At his second trial, petitioner's attorneys made a strategic decision to offer to make stipulations about his gang affiliations, and then to object to much of the gang evidence

---

[5] To the extent that petitioner argues that his attorneys should have objected to "[d]etails regarding the [prior] shootings," petitioner did not make that argument in the post-conviction court, so we agree with the superintendent that the argument was not preserved, and we do not consider it. *See Hale v. Belleque*, 255 Or App 653, 660, 298 P3d 596, *adh'd to on recons*, 258 Or App 587, 312 P3d 533 (2013), *rev den*, 354 Or 597 (2013) ("Preservation principles apply in the context of post-conviction relief and, as a general rule, arguments not made to the post-conviction court in support of a claim will not be considered on appeal.").

that the state sought to admit as cumulative and prejudicial. *Allen II*, 311 Or App at 457. In our view, that strategic decision was reasonable. We must bear in mind that, at his second trial, petitioner did not deny that he drove with two other persons who were gang members to the victim's house; instead, he sought to create a reasonable doubt about whether he participated in shooting the victim. Given that the victim was shot by at least two others who were gang members, it was inevitable that the jury would hear some evidence of petitioner's gang affiliations, so the decision to develop a defense strategy that sought to limit that evidence was reasonable. *See Gorham*, 332 Or at 567 (a reviewing court must not "second-guess" a lawyer's reasonable tactical decisions).

Although we need not reach the second element of petitioner's inadequate assistance claim, we note that "[t]o establish prejudice on a claim based on a trial counsel's failure to object to the admission of evidence, a petitioner must establish that the objection would have been well taken when the criminal case was tried." *Logan v. State of Oregon*, 259 Or App 319, 327, 313 P3d 1128 (2013), *rev den*, 355 Or 142 (2014). "The petitioner must then establish that, given the totality of the circumstances, the admission of the objectionable evidence had a tendency to affect the jury's verdict." *Id*.

Here, if trial counsel had made an objection to evidence of other shootings involving the .380 caliber handgun, or gang evidence more generally, as inadmissible propensity evidence, petitioner fails to demonstrate that the objection would have succeeded. For example, during petitioner's opening statement and in his testimony on direct examination at trial, petitioner himself acknowledged that he was a gang member, which suggests the trial court was not likely to have sustained an objection to the admissibility of gang evidence on propensity grounds. In addition, after admitting gang evidence at trial, the trial court instructed the jury *not* to use it as propensity evidence:

> "You have heard evidence the [petitioner] has some association and involvement with people identified as belonging to gangs. This evidence is not to be used as evidence that

because of that association he was more likely to engage in criminal activity or more likely to engage in the kind of behavior some people believe gang members engage in."

"As a matter of law, we presume that the jurors followed those instructions absent an overwhelming probability that they were unable to do so." *State v. Langley*, 363 Or 482, 526, 424 P3d 688 (2018), *adh'd to as modified on recons*, 365 Or 418, 446 P3d 542 (2019), *cert den*, ___ US ___, 141 S Ct 138, 207 L Ed 2d 1081 (2020). Thus, considering the record before us, petitioner has not shown he was prejudiced by trial counsel's failure to object to the admission of evidence of his gang affiliations as propensity evidence. And, for similar reasons, petitioner has also failed to show he was prejudiced by the failure to object to evidence of other shootings involving the .380 caliber handgun.[6] We therefore affirm on the second assignment of error.

Affirmed.

---

[6] To the extent that petitioner means to separately challenge some of the prosecutor's statements about petitioner made in closing, those arguments were not sufficiently made in the post-conviction court, so we do not address them. *See Zyst v. Kelly*, 338 Or App 597, 607, 566 P3d 1121, *rev den*, 374 Or 188 (2025) (rejecting arguments that petitioner failed to preserve in the post-conviction court).